UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LLOYD RIDDLE,

                 Petitioner,                                   Hon. Richard Alan Enslen

v.                                                 Case No. 5:04-CV-181

PATRICIA CARUSO,

                 Respondent.
_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Riddle's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Riddle's petition be **denied**.


## BACKGROUND

As detailed below, on October 28, 1999, somebody entered Gerald Koetje's home and shot Koetje in the head (from point blank range) killing him. The following individuals were implicated in this crime: (1) Petitioner; (2) the victim's wife, Donna Koetje; and (3) Jay Dolfin, Donna Koetje's brother. All three individuals were charged with first-degree murder and conspiracy to commit first-degree murder. Petitioner was additionally charged with first-degree home invasion and possession of a firearm during the commission of a felony. Petitioner, Koetje, and Dolfin were tried in a

single proceeding with two juries.  One of the juries heard the evidence against Koetje and Dolfin and the second jury heard the evidence against Petitioner.  Numerous individuals testified during this trial.  The relevant portions of their testimony are summarized below.

**<u>Chad Koetje</u>**

Chad was one of Gerald Koetje's three sons.  (Tr. 104-06).  In December 1996, Gerald and Donna Koetje moved to a condominium in Byron Township, the address of which was 1051 Amber Cove.  (Tr. 108-11).  The residence had a two-car garage, from which it was possible to access the condominium.  (Tr. 112-16).  The Koetjes did not lock the access door from the garage into the residence.  (Tr. at 121).  The garage door was operated with a garage door opener.  (Tr. 112).  Chad testified that his parents owned only two garage door openers.  (Tr. 112-13).  One of the garage door openers was located in his father's vehicle and the other was located in his mother's vehicle.  (Tr. 112-13).  Chad indicated that his parents "typically" left the garage door closed with their vehicles parked therein.  (Tr. 114-16).

Gerald Koetje worked at Steelcase and his work schedule varied from 4:00-6:00 a.m. until 3:45 p.m.  (Tr. 123-26).  Koetje was usually asleep by 8:00 p.m.  (Tr. 125-26).  Donna Koetje "was usually not home in the evenings" because she "would be involved with a number of different activities in the evening hours."  (Tr. 127).  Gerald Koetje did not participate in these activities with his wife.  (Tr. 127).

Chad testified that before going to bed in the evening his father would always make sure that the garage door was closed and that the access door (from which

you could enter the garage from the outside) was closed and locked. (Tr. 137-38). According to Chad, there existed only two keys to his parents' home, one of which was possessed by each of his parents. (Tr. 138).

Chad reported that he father had undergone cardiac bypass surgery in 1993 and was also suffering from diabetes. (Tr. 138-39). Chad testified that his father was required to take various (yet unknown to him) medications and that he took his medications as prescribed. (Tr. 140).

Gerald and Donna Koetje had a home computer. (Tr. 142). Gerald Koetje was unable to operate the computer, however. (Tr. 142-44). Moreover, Donna Koetje was the only person who knew the user name and password necessary use to use the computer. (Tr. 143). Chad was permitted to use the computer when he visited, but he was never informed of the user name and password. (Tr. 143). Instead, his mother would enter that information for him. (Tr. 143). Donna Koetje had an electronic mail account and enjoyed spending a lot of time using the computer. (Tr. 143-44). Gerald Koetje, on the other hand, only used the computer room as a place to change out of his work clothes. (Tr. 144).

Chad described his uncle, Jay Dolphin, as "quite knowledgeable" with respect to computers. (Tr. 146). Donna Koetje and Jay Dolphin enjoyed a "very close" relationship. (Tr. 146-47). At family gatherings, the two would "frequently gather off on their own, go for walks, or separate themselves from the rest of the family to converse." (Tr. 147). On the other hand, Gerald Koetje and Jay Dolphin "would talk in passing, but it wasn't like they were best of friends." They "were family members, and that was the extent of it." (Tr. 147).

Following his father's murder, Chad walked through the residence to help identify what had been stolen. (Tr. 134). Chad observed that the following items were missing: his father's wallet and wedding ring, a watch that his father received from Steelcase, a 19 inch television, and a cordless telephone. (Tr. 134). Chad later identified a ring and pocket knife, recovered from his father's truck, as belonging to his father. (Tr. 135-37).

**Deputy Eric Rakow**

At the time of Gerald Koetje's murder, Rakow was a deputy with the Kent County Sheriff's Department. (Tr. 166-67). Shortly after starting his shift on the evening of October 28, 1999, Rakow was dispatched to Gerald Koetje's residence. (Tr. 168-69, 176). Rakow met Donna Koetje at the entrance to the condominium complex in which she lived. (Tr. 173-74). Rakow then followed Ko etje to her residence. (Tr. 173-74). When asked why she had contacted the Sheriff's Department, Koetje indicated that when she arrived home earlier that evening she noticed that her husband's truck was gone. (Tr. 175). Koetje said that she also observed that the door into the residence (from the garage) was open and that there was a black leather coat laying "across the doorway." (Tr. 175-78). Koetje thought that "something was wrong" so she called the Sheriff's Department. (Tr. 175). Koetje theorized to Rakow that perhaps her husband had suffered a heart attack and drove himself to the hospital. (Tr. 175).

Rakow and Deputy Greg Dykstra entered the Koetje residence and eventually proceeded to the master bedroom. (Tr. 177-84). Upon entering therein, Rakow observed Koetje "laying on the bed." (Tr. 184-86). Rakow called out to Koetje

with no response, after which he approached Koetje. (Tr. 186-88). Rakow observed discoloration on Koetje's arm, consistent with the beginning stages of rigor mortis. (Tr. 187-88). After discerning no evidence of a pulse, Rakow pulled the pillow from Koetje's head and observed "a wound to the temple area." (Tr. 188-89). An examination of the residence revealed no evidence of a struggle. (Tr. 189).

       The deputies then exited the Koetje residence and informed Donna Koetje that her husband had passed away. (Tr. 191-92). Koetje was not informed, however, of the manner of her husband's death. (Tr. 192-93). The deputies further informed Donna Koetje that she could not enter the residence because it was a crime scene. (Tr. 193). After being informed of these things Donna Koetje did not ask the deputies any questions about how her husband had died or why the residence was considered a crime scene. (Tr. 192-94). Donna Koetje reported to Deputy Rakow that she had been at the American Legion playing bingo immediately before returning home. (Tr. 197-98, 211-12). During the time that Deputy Rakow accompanied Donna Koetje, she was never informed of the manner in which her husband was killed. (Tr. 199).

       An examination of the residence revealed that the doors leading into the condominium from the outside were all locked and all of the windows were intact. (Tr. 195, 202). The deputies observed no signs of forced entry into the Koetje residence. (Tr. 203). After determining that Gerald Koetje's truck was not at the residence, the deputies, after obtaining a description of the truck (including the license plate number) from Donna Koetje, notified authorities to "watch for" the truck. (Tr. 196).

**Deputy Greg Dykstra**

As of October 29, 1999, Dykstra was a deputy with the Kent County Sheriff's Department. (Tr. 222). Dykstra accompanied Deputy Rakow to the Koetje residence. (Tr. 223-24). After searching the residence, Dykstra informed Donna Koetje that her husband had passed away. (Tr. 224-25). Dykstra did not, however, inform Koetje how her husband had died. (Tr. 225-29). Dykstra then informed Koetje that the residence was considered a crime scene, to which Koetje neither responded nor asked questions. (Tr. 226-29).

Deputy Dykstra then asked Koetje whether she or her husband maintained any weapons in their residence. (Tr. 226-27). Koetje informed Dykstra that there were no weapons in their home, immediately after which she added that "she had never even received a speeding citation." (Tr. 227). Dykstra characterized this comment as an "unusual" comment that "came out of nowhere." (Tr. 227).

**Louis Hunt**

As of the date of Petitioner's trial, Hunt was employed as a supervisor with the Kent County Sheriff's Department Scientific Support Unit. (Tr. 240). At approximately 12:45 a.m. on October 29, 1999, Hunt was dispatched to the Koetje residence. (Tr. 243-44).

Hunt examined the exterior of the Koetje residence, finding no evidence of forced entry. (Tr. 255-59, 291-92). Hunt entered the residence through the garage, accompanied by Detective Todd Self and Deputy Dykstra. (Tr. 247). As part of his examination of the main floor, Hunt observed that a television and video cassette recorder

6

(VCR) "were missing."  (Tr. 251-52).  An examination of the computer room revealed that "numerous items" had been "taken out and moved."  (Tr. 252).  Computer equipment had also "been moved," including the computer monitor, which was "hanging off of the computer desk and resting partially on the chair."  (Tr. 252-53).  The authorities secured the Koetje's computer.  (Tr. 283-84).

Hunt also discovered evidence of blood in the computer room.  (Tr. 263).  Specifically, blood was located on a napkin as well as on an advertisement for the "Fishery."  (Tr. 263).  DNA analysis revealed that this blood belonged to Gerald Koetje.  (Tr. 264).  Dawn Greenwald also examined the computer room for latent fingerprints.  (Tr. 264).  As part of her examination, she discovered "a pair of receipts" on which the name Lloyd Riddle (Petitioner) was located.  (Tr. 264-68).  Petitioner's fingerprints were found on these receipts.  (Tr. 380).  Investigators also removed from the kitchen floor "a number of latent footprints."  (Tr. 285-90).

In the master bedroom, Hunt observed that "there were a number of dressers that had drawers pulled out" and "items on the floor that been in those drawers."  (Tr. 253).  An examination of the master bedroom revealed no evidence of a blood trail or pattern of blood.  (Tr. 261).  The only blood in the master bedroom was located in the immediate vicinity of Gerald Koetje's body and was consistent with a straight down, gravity driven pattern.  (Tr. 261).

Hunt and Greenwald were subsequently instructed to go to Wisconsin as part of the investigation into Gerald Koetje's murder.  (Tr. 294-95).  The pair arrived in Wisconsin on November 4, 1999, at which point they met with Detective Self.  (Tr. 295).  Detective Self gave to Hunt the following items recovered during a search of Petitioner's

property: (a) footwear belonging to Petitioner, and (b) a "small Steelcase knife."  (Tr. 295-96, 304-05).  The search of Petitioner's property revealed a checkbook, in the name of Lloyd Riddle, that contained the type of checks to which a carbon copy is attached. (Tr. 306).  An examination of this checkbook revealed that on October 28, 1999, Petitioner wrote a check, in the amount of fifty dollars, to "Phillips 66."  (Tr. 306-07).

This search also revealed a piece of paper on which the following was written: "Home, 616-878-4829" and "Thursday-Sunday, Thursday."  (Tr. 307-08).  This was the telephone number to the Koetje residence.  (Tr. 346-48).  The other side of this piece of paper contained what appeared to be a telephone number (identified as "804-788-0908 or 00") and a reference to the Crown Plaza hotel in Richmond, Virginia.  (Tr. 308-09).  Another piece of paper recovered during the search contained the following writing, "538-4443" and "Legion."  (Tr. 314-15).  This was the telephone number to the American Legion in Byron Center, Michigan.  (Tr. 348-49).

The police recovered another piece of paper on which the following was written:

> Koetje, 1051 Amber Cove Drive, Southwest, Byron Center, I-96 to 68th Street exit, L on to 68th Street, over the overpass, second Stop-N-Go, Clyde Park, first left, first condo comp. straight to Amber Cove at end (across from mailboxes).

(Tr. 310-12).

The search uncovered another piece of paper on which was written, "Legion, 538-4443" and "Opener, gray."  (Tr. 314-16).  This paper also contained the following writing:

> 2:15 p.m. leave/MAD, plus five hours.  5:00 and 7:15 p.m., plus one ADJ period 8:15 P.  Target time 9:00 p.m. to 9:30.

> 20 MIN period – 9:50.  Out three-quarter 10:00.  Minus one
> ADJ, 0200 to 0300 EST.

(Tr. 316-17).

Authorities also recovered "a carbon copy receipt to a Super Eight Motel," located at 618 Maple Hill Drive, Kalamazoo, Michigan.  (Tr. 317-19).  The receipt was signed by Lloyd Riddle and indicated "arrival" on September 30, 1999, and "departure" on October 1, 1999.  (Tr. 317-19).

During the search of Petitioner's residence, authorities recovered a computer.  (Tr. 319-20).  Officers also recovered a printout of an e-mail dated September 26, 1999.  (Tr. 320-22).  The contents of this particular e-mail were as follows:

> Dear Lloyd – Where have you been all weekend [followed by "numerous" question marks]  Boy, was that a surprise about the baby.  Congratulations.  You never told me you were going to be a new Dad.  How does it feel?  I give you credit, I don't think I am ready to go through all that again.  Three boys are enough headache for me.  CRY, CRY, CRY, all night long, Jay should have had a kid.  I always told him one of these days he would get a knock on the door.  (FROM VIET-NAM).  Hi DADDY!!!!
>
> Am still looking forward to seeing you on Thursday night, have you talked to Jay about a good meeting place?  I will leave my condo around 2:00 in the afternoon so we can spend some time together.
>
> Hope you get some sleep with the new baby, she sure is a cutie.  Maybe I should have had a girl, do they give you as many problems as boys???  My tolerance level is getting low, (I thought you were divorced) guess you will have a long story to tell me.  Later, Donna-mae.

(Tr. 321-22).

Officers also uncovered from Petitioner's residence a printed copy of an e-mail sent from "Jay-Bird" to "Lloyd R."  (Tr. 322-23).  This e-mail was sent on

September 29, 1999.  (Tr. 323-24).  The subject line of the e-mail read "directions."  (Tr. 323).  The contents of this particular e-mail were as follows:

> hey pal, take 90 east to 290 east to the tri-state 294 which shoots you out on I 80 and I 90 or 94 (forgot), once your on 80 east it's about 17 miles to 94 east, signs say Detroit. When you get near Kalamazoo look for 131 north and take that (very tricky) go slow for that one.

> It's the 2 exit I think M43, go right, through the light on the left.  Hour and a half to get out of Wisconsin, 3 to 4 hours to get past Gary, Ind.  Two hours or less to Kalamazoo. Kalamazoo 363 miles from my house.  8 tolls i think 40 cents have the right change, it will safe lots of time.  A quarter dime and nickel or five pennies is all it takes.

> on the way to Kalamazoo i remember a sign that says Detroit 294 miles so you got a cruise.  Cheap hotels in Kalamazoo, give Ma & Pa a call if you like.  have fun pal – any questions???

> coming back just follow the signs for 80 WEST, hook up to 294 and follow the signs to Rockford.

> have a gas, later, Jay.

(Tr. 324-25).

Hunt believed these to constitute directions from Madison, Wisconsin to Kalamazoo, Michigan.  (Tr. 388-89).  At the very bottom of the printout was the following: "Printed for Lloyd Riddle, lloydR@terracom.net, 9-29-99."  (Tr. 325).

Detective Self also instructed Hunt and Greenwald to process a 1988 Chevrolet Blazer that authorities had seized.  (Tr. 297-99).  In the center console of this vehicle, Hunt discovered a "Bical" semi-automatic pistol, equipped with what appeared to be a silencer.  (Tr. 300-03).  Hunt also discovered in the center console a "small" flashlight, as well as "a portion of a latex glove, and a latex glove, and there was a black hood, as well."  (Tr. 301-03).  Hunt further discovered in the center console "a printout of

an E-mail," the subject line of which was "1051 Amber Cove Drive."  (Tr. 303).  The

first paragraph of this e-mail read as follows:

> Dear Lloyd, you can just send it to me, Donna Mae Koetje,
> 1051 Amber Cove Drive, SW, Byron Center, Michigan.
> As for Diane, she just sent a check to pay for it.  Jay told
> me that you ordered on a trial run to see if it worked.  Is the
> 200 enough?  Diane just did not want to cheat you out of
> any money.  Let me know when you are going to send it.

(Tr. 349-50).

The search of Petitioner's residence also produced "a lot of" guns,

ammunition, and computer disks, as well as "some" articles of clothing.  (Tr. 329).  One

of the items of clothing recovered at Petitioner's residence was a brown leather jacket.

Inside this jacket officers discovered a "Pocket Pal 1999" planner, in which the name

"Lloyd Riddle" was written.  (Tr. 331).  Also located in this jacket was a "soft pistol

case" in which officers discovered a Jennings J-22 semi-automatic pistol and magazine.

(Tr. 329-33, 367-68).


**Barbara Sutter**

Sutter lived next door to the Koetjes.  (Tr. 391).  On October 28, 1999,

Sutter arrived home from work at approximately 5:00 p.m.  (Tr. 395).  She and her

husband later departed their residence, returning home between 9:30 and 10:00 p.m.  (Tr.

395-98).  When they arrived home, the Koetje's garage door was closed and Sutter

observed nothing out of the ordinary with respect to the Koetje residence.  (Tr. 398-401).

Sutter did not hear or observe anything out of the ordinary until being awakened by the

police early the following morning.  (Tr. 401).

**Douglas Robertson**

As of October 1999, Robertson worked part-time as a truck driver for RTS Transportation.  (Tr. 447).  At approximately 10:40 p.m. on the evening of October 28, 1999, Robertson arrived at the RTS facility.  (Tr. 448-49).  As Robertson was preparing to enter the parking lot he observed a white pick-up truck enter the RTS driveway and park.  (Tr. 450).  Robertson then observed one or two men exit the white pick up truck and "run" to a dark colored Chevy Blazer parked nearby.  (Tr. 450-62).  Robertson subsequently identified Ralph Zielinski as one of the men that exited the white pick-up truck that night.  (Tr. 471-76).

**Deputy Nicholas Kaechele**

As of October 29, 1999, Kaechele was employed as a deputy for the Kent County Sheriff's Department.  (Tr. 410-11).  Shortly after midnight on the morning of October 29, 1999, Kaechele received a dispatch to "be on the lookout for" a white pick-up truck.  (Tr. 412).  At approximately 12:59 a.m. Kaechele was instructed to proceed to RTS Trucking.  (Tr. 412-14).  Upon arrival, Kaechele observed a white pick-up truck in the parking lot.  (Tr. 413).  An examination of the pick-up's license plate revealed that it "matched" that of the pick-up truck he had been instructed to "be on the lookout for." (Tr. 413).  Kaechele observed that the pick-up truck was "dew-covered" suggesting that it had been sitting there for "a while."  (Tr. 416).  Through the open window Kaechele observed a garage door opener and a Steelcase identification on the seat.  (Tr. 416-17).

Kaechele was later dispatched to the Koetje residence.  (Tr. 420).  Upon his arrival, Kaechele observed that Donna Koetje was sitting in the victim advocate's

vehicle.  (Tr. 421-22).  Kaechele was then instructed "to go with [the victim advocate and another officer] and make death notification to the [two] sons that were in town."  (Tr. 421).  Kaechele arrived first at Brian Koetje's residence.  (Tr. 424).  Brian Koetje was informed that his father had died, but he was not informed of the manner of death.  (Tr. 424-25).  Kaechele and the others then proceeded to Chad Koetje's residence, informing him of his father's death.  (Tr. 427-28).  Chad Koetje was likewise not informed as to the manner of his father's death.  (Tr. 428).  Kaechele also testified that no mention was made in Donna Koetje's presence of the manner of Gerald Koetje's death.  (Tr. 428).

**Tony Powers**

As of October 29, 1999, Powers was a volunteer with the Kent County Victim's Services Unit.  (Tr. 436-37).  Powers' role was to "assist the Sheriff's Department in sudden death notifications and short-term, brief counseling."  (Tr. 437).  At approximately 12:45 a.m. on October 29, 1999, Powers was dispatched to the Koetje residence.  (Tr. 438).  Powers arrived at approximately 1:00 a.m. at which point he was introduced to Donna Koetje.  (Tr. 439).

Powers stayed with Koetje and later accompanied her as police officers notified Brian and Chad Koetje that their father had died.  (Tr. 439-43).  During the time he spent with Donna Koetje, Powers never heard anybody mention the manner of Gerald Koetje's death.  (Tr. 441-44).  Powers further testified that neither Brian nor Chad Koetje were informed of the manner in which their father died. (Tr. 443-44).

**Janet Erlandson**

At the time of Gerald Koetje's murder, Erlandson was employed as a Kent County Sheriff's Department detective. (Tr. 479-81). Erlandson and Detective Robert Peters met with Donna Koetje at approximately 11:00 a.m. on October 29, 1999. (Tr. 481-84). This meeting occurred at Chad Koetje's residence. (Tr. 483). The purpose of this meeting was to determine if Donna Koetje could identify any of the items recovered from Gerald Koetje's pick-up truck. (Tr. 483-84). The detectives also wanted to ask Donna Koetje "some general questions about the security of her condo." (Tr. 485-86).

Donna Koetje was able to positively identify a ring recovered from Gerald Koetje's pick-up truck as belonging to her husband. (Tr. 483-85, 493). Erlandson and Peters then asked Donna Koetje if they could speak with her privately, to which Koetje agreed. (Tr. 485-88). Because officers had earlier recovered from the Koetje residence a pair of receipts on which Petitioner's name was located, Erlandson asked Donna Koetje "if the name of Lloyd Riddle meant anything to her." (Tr. 490-92). Koetje responded that "the name meant nothing to her." (Tr. 492). When asked what she had been doing the previous evening, Koetje responded that she had played bingo. (Tr. 496-97).

Later that day, at approximately 1:30 p.m., Erlandson, Donna Koetje, Chad Koetje, and Brian Koetje met at Donna Koetje's residence "to see what was taken." (Tr. 500-01). Donna Koetje reported that a 19-inch television (and the accompanying remote), a tape recorder, and a tape rewinder had been stolen. (Tr. 501-02). She also reported that a new cordless telephone had been stolen. (Tr. 502). Because Koetje still had the box in which the telephone was packaged, Erlandson was able to obtain the model and serial numbers for the telephone. (Tr. 502). Donna Koetje reported that

numerous items had been taken from the master bedroom: (1) several items of jewelry belonging to her husband; (2) several items of her jewelry; and (3) five-hundred dollars cash. (Tr. 504).

Later that afternoon, Erlandson again met with Donna Koetje at Chad Koetje's residence. (Tr. 505-06). Erlandson had been instructed to obtain Donna Koetje's fingerprints "for elimination" purposes. (Tr. 505-06). After obtaining Donna Koetje's fingerprints, Erlandson spoke with Koetje about her family. (Tr. 506). Koetje reported that of her several siblings, she was closest to her brother Jay who lived in Wisconsin. (Tr. 506-07). Koetje further reported, however, that "it had been at least three months since she had any contact with Jay." (Tr. 916). When Donna Koetje was asked about her husband, she responded that "there had never been any conflict between any of her family members and Gerald." (Tr. 507). She specifically stated that "there was no bad blood between Jay and Gerald." (Tr. 915-16). Erlandson also asked Donna Koetje to identify her "close personal friends." (Tr. 511). Koetje identified Diane Thompson. (Tr. 511).

Erlandson again spoke with Donna Koetje on the afternoon of October 31, 1999. (Tr. 512-13). During this conversation Koetje was again asked "if she knew anyone by the name of Lloyd Riddle." (Tr. 514). Koetje initially responded that "she didn't know anybody by the name of Lloyd Riddle," but after a moment Koetje "stated that she did know the name, but she did not know him." (Tr. 514). Koetje explained that "she had received e-mails from Mr. Riddle" who she described as "a friend of her brother Jay's, and that Jay and Mr. Riddle know each other through support groups for post traumatic stress syndrome." (Tr. 514). Koetje indicated, however, that Petitioner had

never been to her home and did not even know where she lived.  (Tr. 515).

Koetje reported that Diane Thompson had asked her whether Koetje's brother Jay might be able to obtain "prescription medications at a cheaper price than Mrs. Thompson was able to get them here."  (Tr. 515).  Donna Koetje reported that she asked her brother Jay to help and consequently "she had received drugs through the mail from Jay."  (Tr. 515).  Koetje stated that she did not know where her brother obtained these drugs.  (Tr. 516).  Koetje further stated that she "did not remember if she ever received any drugs in the mail from Lloyd."  (Tr. 516).

Erlandson subsequently traveled to Wisconsin and participated in the search of Petitioner's residence.  (Tr. 522-33, 916-17).  One of the items recovered in the search was a receipt from a Super 8 Motel located in Kalamazoo, Michigan.  (Tr. 917-18).  This receipt was dated September 29, 1999, and was signed by "Lloyd Riddle."  (Tr. 917-18).  Erlandson subsequently traveled to the Super 8 Motel and verified that a man named "Lloyd Riddle" had, in fact, stayed at that motel on the night in question.  (Tr. 919).

The search also revealed a piece of paper on which the following e-mail address was written: dmkoetje@gateway.net.  (Tr. 920-23).  Officers also discovered "a computer-generated photograph" of Donna Koetje on which was printed, "From dmkoetje, To lloydr@terracom.net."  (Tr. 923).  This photograph was dated July 29, 1999).  (Tr. 924).

Erlandson also spoke with Connie Riddle who indicated that Ralph Zielinski could provide Petitioner with an alibi.  (Tr. 932-35).  Erlandson went to Zielinski's residence and informed him that they wanted to speak with him about "a

serious crime in Michigan." (Tr. 935-36). At the outset of their conversation, Zielinski was "was calm but then as the conversations went on, he became more and more upset, to the point he was crying, and shaking and sobbing." (Tr. 936). Eralndson testified that Zielinski did not provide Petitioner with an alibi. (Tr. 936).


**Ralph Zielinski**

Zielinski met Petitioner in 1995, when he was living in Madison, Wisconsin. (Tr. 539-43). Petitioner was working at Madison Area Technical College, where Zielinski attended. (Tr. 544). Zielinski and Petitioner developed a rather close friendship. (Tr. 544-46). The two regularly ate lunch together and spent time together at Petitioner's residence. (Tr. 545). Zielinski also accompanied Petitioner on trips to a second house Petitioner owned in northern Wisconsin. (Tr. 545). Zielinski testified that he often accompanied Petitioner on spur-of-the-moment drives around town or to more distant places like Milwaukee or northern Wisconsin. (Tr. 553-54). Petitioner also introduced Zielinski to Jay Dolfin. (Tr. 547-48).

Zielinski testified that while Petitioner has only one leg "he has a prosthetic leg he wears, and we did a lot of activities together." (Tr. 550). Zielinski testified that Petitioner was able to mow his lawn, rebuild a shed, walk through the woods, get into and out of a tree stand, carry computer boxes, and connect "heavy" snow equipment to his tractor. (Tr. 550-52). Zielinski reported that Petitioner "got around very well" and that there was not anything which Petitioner could not do for himself. (Tr. 551-52).

Sometime in October 1999, Zielinski was riding around with Petitioner

when they encountered Jay Dolfin.  (Tr. 611).  Petitioner and Dolfin both pulled off the road and Petitioner entered Dolfin's vehicle.  (Tr. 611-12).  Zielinski remained in Petitioner's vehicle, but he could observe Dolfin writing on a piece of paper that he then gave to Petitioner.  (Tr. 612-13).  Petitioner returned to his vehicle and laid the piece of paper on the console.  (Tr. 613).  Zielinski picked up the paper when it fell to the floor and was able to see that the paper contained directions.   (Tr. 613-14).  Specifically, Zielinski observed the following words on the paper: (1) "Koetje," (2) "Byron Center," and (3) "I-96 to 68th Street."  (Tr. 614-15).

Later that month, Petitioner telephoned Zielinski and asked if he "wanted to go on a road trip."  (Tr. 566-68).  Zielinski agreed and the pair departed for Michigan in Petitioner's Blazer.  (Tr. 568-70).  Petitioner told Zielinski that he "wanted to see a friend of his" in Grand Rapids.  (Tr. 569).  After arriving in Grand Rapids, Petitioner stopped at a truck stop (on 76th Street) where he and Zielinski ate lunch.  (Tr. 569-70).  After lunch, Petitioner "made a couple calls, and then he left for a while."  (Tr. 570-72).  When Petitioner returned, he and Zielinski "drove around for a while" before returning to Madison.  (Tr. 570-72).

Approximately ten days later, Petitioner asked Zielinski if he wanted to ride with him to Grand Rapids again.  (Tr. 566-67, 572).  Zielinski agreed and the pair left Madison at approximately 3:30 p.m. (Wisconsin time) in Petitioner's Blazer.  (Tr. 572-73).  By the time the pair arrived in Grand Rapids it was dark.  (Tr. 573-75).  Petitioner returned to the same truck stop the pair had visited on their last trip to Grand Rapids.  (Tr. 574-75).  Petitioner then indicated that he "wanted to go see a friend of his" and drove off.  (Tr. 575-76).  Petitioner told Zielinski that he would return "in a little

while." (Tr. 576).

Petitioner returned approximately 20-40 minutes later and told Zielinski "that he needed some help moving a friend of his truck, because he was dropped off at work." (Tr. 576-77). Zielinski responded, "okay, let's go." (Tr. 578). Petitioner drove to a "suburban area," approximately two miles away, "where there was a lot of condos." (Tr. 578). Petitioner approached one of the units, activated a garage door opener, drove into the garage, and then closed the garage door. (Tr. 578-85). There was a white pick-up truck in the garage and Petitioner told Zielinski that this was the truck they had to move. (Tr. 583-85).

Before moving the truck, Petitioner asked Zielinski to move "a TV and some bags" into the back of his Blazer. (Tr. 584-87). Petitioner then entered the condominium and exited "a couple minutes" later wearing "surgical gloves." (Tr. 587-88, 710). Petitioner then instructed Zielinski to drive the pick-up truck. (Tr. 587-88). Zielinski got into the pick-up truck, discovered the keys in the ignition, and exited the garage following Petitioner, who was driving his Blazer. (Tr. 588-89). Zielinski parked the truck where Petitioner instructed. (Tr. 589-91). As he was parking the pick-up truck, Zielinski observed "a truck coming in behind [him]." (Tr. 590). Once Zielinski parked the pick-up truck, Petitioner "started hollering, 'hurry up and get to the Blazer.'" Petitioner was "pretty mad" that another truck driver spotted Zielinski driving the white pick-up truck. (Tr. 592-97). Zielinski did as instructed and the pair drove away. (Tr. 592-97).

During the drive back to Wisconsin, Zielinski asked Petitioner "what was going on" because "things just didn't seem right." (Tr. 622-23). Petitioner responded, "I

had to take a guy out." (Tr. 623). A short time later Zielinski again asked Petitioner "what was going on," to which Petitioner stated that "he just had to take a guy out, he was doing Jay and Donna a favor." (Tr. 624). Petitioner took Zielinski back to his residence, but before leaving Petitioner told him that "if Connie [Petitioner's ex-wife] says anything to you, just tell her that I was here drinking brandy with you." (Tr. 550, 626).

**Joseph Huber**

Huber was the manager of telecommunications and infrastructure with the Madison Area Technical College, in Madison, Wisconsin. (Tr. 875). He was responsible for the college's telecommunications and networking architecture, including the "electronic mail systems at the college." (Tr. 875). On November 10, 1999, Huber was served with a search warrant the purpose of which was to search the college's computer system for e-mail sent by or to Petitioner. (Tr. 876-77).

This search revealed that on September 13, 1999, Petitioner sent an e-mail to Jay Dolfin in which he indicated that Petitioner was going to his cottage on Saturday to "try and get as much done as we can on finishing the laundry room." (Tr. 877-95). The email also included directions that referred to roads in Wisconsin. (Tr. 895). The email concluded with the word "Lloyd." (Tr. 895). Dolfin's response to this e-mail, transmitted later that day, read as follows:

> roger dodger lima charlie okie dokie, so you don't think the sis' will do the deed. She was supposed to do it today but have heard nothing. My money on yes. She been hassled and abused to much, no were to go. Desprite people do desprite things, time will tell. Glad the blue's came in – i'll try one wednesday to check them out.

(Tr. 895-96).

A search of Petitioner's work station uncovered several computer disks, one of which was labeled "Detroit 10-99." (Tr. 898-902). This disk contained five files, each of which constituted a digital photograph of a different individual. (Tr. 898-902). One of these digital files was named "Donna." (Tr. 903). All of these photographs "had dates from late September to early October." (Tr. 902).

**Steve McQuade**

As of October 1999, McQuade worked as a cashier at the Phillips 66 gas station in DeForest, Wisconsin. (Tr. 990-91). Petitioner, who lived approximately two miles from the gas station, was a regular customer, stopping every morning to "get coffee and talk, and every once in a while buy gas." (Tr. 991-93). Petitioner was permitted to charge items he purchased at the gas station to his account. (Tr. 994). On the morning of October 28, 1999, Petitioner stopped by the gas station to pay on his charge account. (Tr. 993-99). McQuade gave Petitioner a receipt for this payment. (Tr. 996-99). Petitioner placed the receipt in his pocket. (Tr. 1008).

**Officer James Pertzborn**

As of October 1999, Pertzborn was employed as a police officer in DeForest, Wisconsin. (Tr. 1016). On November 4, 1999, detectives from the Kent County Sheriff's Department interviewed Petitioner. (Tr. 1016-18). Following this interview, Pertzborn arrested Petitioner. (Tr. 1019).

Following his arrest, Petitioner told Pertzborn that he wanted to talk to

him.  (Tr. 1019).   Before speaking with Petitioner, Pertzborn informed him of his Miranda rights.  (Tr. 1020-21).  After informing Petitioner of these rights Pertzborn asked Petitioner, "are you now willing to answer questions or make a statement?"  (Tr. 1021). Petitioner "stated he was" and Pertzborn asked him, "well, what would you like to talk to me about?"  (Tr. 1021).   Petitioner "didn't say anything" in response.  (Tr. 1022). Pertzborn then asked Petitioner "what he was thinking."  (Tr. 1022).   Petitioner responded that, "well, I ain't saying I wasn't involved in the planning.  I just can't explain how my receipts were found there."  (Tr. 1022-27).   When Pertzborn asked Petitioner, "so you're saying you helped plan this," Petitioner stated, "no."  (Tr. 1034).

**Detective Robert Peters**

As of October 1999, Peters was employed as a detective with the Kent County Sheriff's Department.  (Tr. 1037).  On October 29, 1999, at approximately 11:00 a.m., Peters met with Donna Koetje at Chad Koetje's residence.  (Tr. 1037-42).  During his conversation with Koetje, she never asked how her husband had been killed.  (Tr. 1043-44).  As he was preparing to leave, Chad Koetje asked Peters "how his father had been murdered."  (Tr. 1045).  Knowing that the autopsy of Gerald Koetje had already been completed and that information about the manner of his death would likely be broadcast during the upcoming noon newscasts, Detective Peters informed the Koetje family that Gerald Koetje "had been shot."  (Tr. 1046-48).

Peters subsequently learned that prior to informing the Koetje family of the manner of Gerald Koetje's death, Donna Koetje had informed Diane Thompson that Gerald Koetje "had been shot."  (Tr. 1051-54).  As a result, Detective Peters found it

necessary to determine whether he had, in fact, been the first individual to divulge to Donna Koetje that her husband had died from a gunshot wound.  (Tr. 1051-52).  His investigation revealed that "the first time [he could] establish that anybody would have released information that Mr. Koetje died because of a gunshot or was shot was on the noon news report."  (Tr. 1052-53).

Detective Peters subsequently traveled to Wisconsin in an attempt to locate and interview Petitioner.   (Tr. 1054-58).   On November 4, 1999, Peters, accompanied by other police officers, approached Petitioner as he walked to his vehicle after work.  (Tr. 1057).   Peters introduced himself to Petitioner, who stated that "he figured we'd be coming to talk to him about Jay's brother-in-law."  (Tr. 1058).  Petitioner agreed to speak with Peters.  (Tr. 1058-59).  Before transporting Petitioner to the police station, another detective frisked Petitioner to make sure that he was not carrying a weapon (or anything that could be used as a weapon).  (Tr. 1059-60).   This search revealed that Petitioner was carrying a "Steelcase knife."  (Tr. 1060).

Detective Peters saw the knife and said to Petitioner, "hey, this is kind of a cool knife."  (Tr. 1060-61).   Petitioner responded that "the school buys a lot of their furniture and that kind of equipment from Steelcase, and [the knife] had been given to all the employees because the Madison Area Technical College was such a good customer of Steelcase's."   (Tr. 1061).   Detective Peters subsequently investigated this claim and learned that "it's against [Steelcase] policy for their sales staff to do that so it don't look like it's a kickback."   (Tr. 1061).   Steelcase officials further informed Peters that Steelcase had "never done anything like that."  (Tr. 1062).  Detective Peters later showed this knife to Chad Koetje, who "instantly said, 'oh my God, that's my father's knife.'"

(Tr. 1062).

After transporting Petitioner to the DeForest Police Department, Detective Peters advised Petitioner of his Miranda rights. (Tr. 1062-64). Peters asked Petitioner "if he knew why we were there to talk to him, and [Petitioner] explained, yes, that we wanted to talk to him about Jay's brother-in-law." (Tr. 1064). When asked when he had last spoken with Jay Dolfin, Petitioner stated that he had spoken with Dolfin the previous day. (Tr. 1065). Petitioner further stated that he and Jay were "real good friends" who "did a lot of hunting together" and "helped each other on small projects" around their houses. (Tr. 1065).

When asked whether he knew Donna Koetje or Gerald Koetje, Petitioner "first said he didn't know 'em, and then he kind of backed off that a little bit and said that he had exchanged some e-mails with Donna Koetje, but he'd only exchanged those e-mails through, forwarding through Jay Dolfin." (Tr. 1065). Petitioner further stated that he "hadn't talked to them personally." (Tr. 1066). Petitioner also denied ever being in the Koetje residence. (Tr. 1066-67).

Peters then asked Petitioner where he was on the evening of October 28, 1999, through October 29, 1999. (Tr. 1068-69). Petitioner responded that he and Ralph Zielinski had been "drinking blackberry brandy all night together." (Tr. 1069). Petitioner was then shown photocopies of the two receipts that officers had recovered from Gerald Koetje's home. (Tr. 1070-71). Petitioner identified the two receipts as belonging to him. (Tr. 1071). When Petitioner was informed that the receipts "were found on the floor of the Koetje residence," Petitioner "immediately broke down into a very profuse sweat." (Tr. 1075). When asked "if he could explain why those receipts

was in that crime scene or inside the Koetje home," Petitioner responded, "I wish I could explain." (Tr. 1075-76).

Detective Peters subsequently left the interview to speak with Detective Erlandson. (Tr. 1076). Erlandson informed Peters that Zielinski had not confirmed Petitioner's alibi story. (Tr. 1082). When Detective Peters informed Petitioner that Zielinski "was not supporting his alibi," Petitioner "sat back in the chair, crossed his arms, dropped his head, and did not respond." (Tr. 1082-83).

**Diane Thompson**

Thompson testified that she had been "very close friends" with Donna Koetje since 1993. (Tr. 1246-48). Thompson and Koetje talked "three, four times a week" and "went out for coffee, to the movies, to dinner, and this was on a weekly basis." (Tr. 1248-49).

With respect to the relationship between Donna and Gerald Koetje, Thompson testified that their marriage was "pretty rocky" and that Donna Koetje "was bitter in some ways, but she was unhappy." (Tr. 1255). Thompson described the interaction between Gerald and Donna Koetje as "a little distant" and "a little abrasive." (Tr. 1266). Thompson described an incident where Gerald Koetje asked his wife what she wanted for her birthday, to which Donna Koetje responded, "a divorce." (Tr. 1266). Thompson also described another incident in which Gerald Koetje stated, "fifteen more years or so I'm going to be married 50 years," to which Donna Koetje responded, "gee, I hope I'm dead by that time." (Tr. 1266).

Donna Koetje told Thompson that she "felt a little nervous" about her

husband's pending retirement.  (Tr. 1255-56).  Koetje feared that "she would lose her freedom" and that her husband "would be asking where she was going and what she was doing, in and out of the house, those types of things."  (Tr. 1256).  On "several" occasions Thompson asked Donna Koetje why she did not simply divorce her husband. (Tr. 1256).  Koetje responded that because of her own health difficulties "she needed the financial security and the insurance card."  (Tr. 1256-57).  Koetje also confided in Thompson that she had previously had an affair with another man from 1994 "until maybe 1998."  (Tr. 1250-52, 1308).  Koetje also told Thompson, in September 1999, that she was going to meet with Petitioner in Kalamazoo.  (Tr. 1277).

Donna Koetje further expressed to Thompson concerns she had about her family's finances and her husband's spending habits.  (Tr. 1258).  Prior to Gerald Koetje's death, he and Donna Koetje attended a wedding in New York.  (Tr. 1258). Donna Koetje was concerned about the amount of money that was being spent to attend this wedding. (Tr. 1258-59).  Koetje also told Thompson that she feared that her husband had a gambling problem.  (Tr. 1260).  In this regard, Koetje told Thompson that she once "accidentally" opened a credit card bill and realized that the balance on the card was "like twenty-five thousand."  (Tr. 1260).

Donna Koetje told Thompson that her husband "had some medical problems" and that "his health was increasingly declining."  (Tr. 1260-61).  Koetje told Thompson that when her husband died she would be able to "just live off the interest" of Gerald Koetje's Steelcase retirement account.  (Tr. 1261).

On the morning following Gerald Koetje's murder, between 9:00-9:30 a.m., Donna Koetje telephoned Thompson.  (Tr. 1268).  Koetje told Thompson that

"something terrible has happened."  (Tr. 1268).  When Thompson asked "what is it?" Koetje responded that "well, we had a break-in, and Gerald's been shot."  (Tr. 1268-69).

**Cheryl Shanahan**

At the time of Petitioner's trial, Shanahan was employed by Steelcase at its Retirement Plan Accountant.  (Tr. 1340-41).  Shanahan testified that following Gerald Koetje's death, Donna Koetje requested a complete distribution of the amount in her husband's retirement account.  (Tr. 1344-45).  As of the date of distribution, Gerald Koetje's retirement account was valued at $511,935.27.  (Tr. 1344).

Shanahan testified that had Donna Koetje divorced her husband she would no longer have been covered under Gerald Koetje's medical insurance, but would instead have only been eligible to receive COBRA coverage for a period of thirty-six months.  (Tr. 1347-48).  On the other hand, the surviving spouse of a Steelcase employee is "offered three months free coverage for every year of service that the employee worked." (Tr. 1348).  Considering Gerald Koetje's thirty-four years of service to Steelcase, Donna Koetje would have received free health coverage on her husband's plan for "eight-and-a-half years."  (Tr. 1349).  Shanahan testified that when Steelcase employees get divorced a court decides on the distribution of the employee's retirement account, whereas if an employee dies, the surviving spouse "gets it all."  (Tr. 1364-65).

Shanahan also testified that Steelcase utilized a "voice-response system" (Benefits Express) which enables Steelcase employees to obtain - over the telephone - information concerning their retirement account.  (Tr. 1349).  To access the system, the employee had to input his social security number and PIN number.  (Tr. 1349-50).

Shanhan indicated, however, that anybody could access this system, so long as they knew the employee's social security number and PIN number.  (Tr. 1350).  Shanahan testified that on September 27, 1999, somebody telephoned Benefits Express and accessed the account balance in Gerald Koetje's retirement account six times.  (Tr. 1351).  Shanahan further testified that on the day of Gerald Koetje's murder, somebody telephoned Benefits Express and accessed the account balance in Gerald Koetje's retirement account eleven different times.  (Tr. 1350).  The last of these eleven calls was placed at 5:39 p.m.  (Tr. 1352).

**Dr. Steven Cohle**

Dr. Cohle was the forensic pathologist who performed the autopsy on Gerald Koetje.  (Tr. 1368-80).  An examination of Petitioner revealed that "he had a gunshot wound in the right temple."  (Tr. 1393).  The doctor recovered from Koetje's brain "a small caliber bullet."  (Tr. 1400).  As this bullet passed through Gerald Koetje's brain it "severed, or cut, in half one of the major arteries that supplies blood to the brain."  (Tr. 1400).  Dr. Cohle observed "no evidence of internal injury other than what was in the head."  (Tr. 1407).  The doctor concluded that "the cause of [Gerald Koetje's] death is the gunshot wound to the head, and the manner of death is homicide."  (Tr. 1415).

**Dr. Bernard Eisenga**

Dr. Eisenga testified as an expert in the field of toxicology.  (Tr. 1444-47).  The doctor testified that Nitroglycerin is a type of organic nitrate.  (Tr. 1456).  Dr. Eisenga further testified that ingesting both Nitroglycerin and Viagra is "absolutely

contraindicated" and could, but not necessarily, result in the individual's death.  (Tr. 1456-64).

**Dr. Janet Talmo**

Dr. Talmo was a family physician who began treating Gerald Koetje in 1993.  (Tr. 1475-77).  The doctor testified that Gerald Koetje had never requested that he be prescribed Viagra.  (Tr. 1491).  Dr. Talmo further testified that had Koetje requested Viagra she "would not have prescribed that with his current medications."  (Tr. 1491-92).  When asked to describe the effect that taking Viagra would have had on Gerald Koetje, the doctor stated that "it potentially causes death, because it accentuates the hypertension and he could die from his nitrates, if it was combined with his nitrates."  (Tr. 1492).

**Christine Stepleton**

At the time of Petitioner's trial Stepleton was employed by the Michigan State Police as a forensic scientist.  (Tr. 1532).  Stepleton testified that she specialized in "the microchemical subunit" which "involves trace evidence, which can be things such as impression evidence, so footwear, tire track impressions, fabric impressions. . .glass, hairs, fibers, soils, [and] fire debris."  (Tr. 1533-34).  Stepleton was permitted to testify as an expert in her area of expertise.  (Tr. 1534-35).

As part of the investigation into Gerald Koetje's murder, Stepleton examined a pair of Petitioner's boots and a series of eleven "gel lifts" obtained from the "linoleum floor in the kitchen" of the Koetje residence.  (Tr. 284-92, 295-97, 1535-38).  With respect to gel lifts, Stepleton testified that:

[I]f you have a tile floor, or a desk, or maybe glass, or something where there's an impression, and either you can see the impression visually or if you powder it up, it enhances the impression so that you can see the impression. And then to pick up that impression, you can use something called a gel lift.  And what you do is just place it right on top of the impression and it comes up, kind of like tape with fingerprints. . .It's like a gel that sticks down and then it brings up that impression.

(Tr. 1538).

Stepleton testified that she was "very surprised" when she examined Petitioner's boots because they did not exhibit the type of wear pattern created by a person "walking on both legs with his normal weight, shifting back and forth on each leg."  (Tr. 1543).  Stepleton testified that it appeared that the "left shoe was worn a lot longer, a lot more, that type of thing, than the right shoe."  (Tr. 1543).  She indicated that "as to each other, these [boots] are pretty unique."  (Tr. 1544).  Stepleton testified that when she performed her various examinations she was unaware that Petitioner walked on a prosthetic leg.  (Tr. 1543).

Stepleton's examination of the gel lifts revealed that two of the lifts "exhibited gross pattern agreement to the left boot, and could have been produced by the left boot."  (Tr. 1548-52).  Her examination also revealed that another of the lifts "had pattern agreement to the right boot, and could have been produced by that right boot."  (Tr. 1545-52).  Stepleton also examined a pair of boots recovered from Ralph Zielinski.  (Tr. 1550).  After examining Zielinski's boots, Stepleton concluded that she "could not associate the boots from Mr. Zielinski to any of the impressions [she] received from the crime scene."  (Tr. 1550-52).

**James Pierson**

At the time of Petitioner's trial, Pierson was employed by the Michigan State Police as a latent fingerprint examiner.  (Tr. 1566).  Pierson examined the receipts (on which Petitioner's name was located) recovered from the Koetje residence.  (Tr. 1566-72).  Pierson was able to recover three latent fingerprints from these receipts, one of which he identified as belonging to Petitioner.  (Tr. 1572-75).

**Joseph Roney**

At the time of Petitioner's trial, Roney worked as a detective sergeant for the Michigan State Police Forensic Unit.  (Tr. 1588-89).  He testified as an expert in the field of firearms identification.  (Tr. 1590).  Roney testified that "the science of firearms identification is the association of ammunition components back to a particular firearm" and that "by ammunition components, we mean fired cartridge casings, fired bullets, [and] fired shot shells."  (Tr. 1591).

Roney examined the bullet that was recovered from Gerald Koetje's brain. (Tr. 1592-99).  He also examined and test-fired the Jennings J-22 pistol recovered from Petitioner's residence.  (Tr. 329-33, 1599-1604).  Roney testified that he was unable to positively identify the particular weapon that fired the bullet recovered from Gerald Koetje because the bullet had suffered "quite a bit of damage."  (Tr. 1604-05).  Roney was able to conclude, however, that the bullet recovered from Gerald Koetje's brain "could have been fired from" the Jennings J-22 pistol recovered from Petitioner's residence.  (Tr. 1604).

**Detective Todd Self**

As of October 1999, Self served as a detective for the Kent County Sheriff's Department. (Tr. 1619-20). At approximately 1:35 a.m. on October 29, 1999, Self was dispatched to the Koetje residence. (Tr. 1620). Detective Self participated in a "walk-through" of the residence, the results of which revealed no evidence of forced entry. (Tr. 1623-28). During his investigation of the Koetje residence, Self and Detective Greenwald discovered "two receipts" on which the name Lloyd Riddle was written. (Tr. 1648-49). These receipts were dated October 28, 1999. (Tr. 1649-50).

Detective Self then spoke with Donna Koetje "about why she had called the police and what had happened." (Tr. 1631-40). During this conversation, Koetje related that she had recently traveled to Richmond, Virginia, and stayed at the Crown Plaza. (Tr. 1641). Detective Self then testified that one of the items recovered during the search of Petitioner's residence was a piece of paper on which was written, "804-788-8900, Crown Plaza, Richmond, VA." (Tr. 1641-42).

Detective Self testified that when Petitioner was arrested he had in his possession a telephone calling card. (Tr. 1669-70). Subsequent investigation revealed that this calling card had been used to place two telephone calls to the Koetje residence. (Tr. 1670-73). The first call was placed at 11:51 p.m. on October 19, 1999, and was 33 minutes in duration. (Tr. 1671). The second call was placed at 12:06 a.m. on October 27, 1999, and lasted for 38 minutes. (Tr. 1673).

**Dawn Greenwald**

At the time of Petitioner's trial, Greenwald was employed as an evidence

technician in the Kent County Sheriff's Department Scientific Support Unit.  (Tr. 1897-98).  Greenwald was dispatched to the Koetje residence in the early morning hours of October 29, 1999.  (Tr. 1899-1900).  She was initially tasked with photographing and documenting the exterior of the Koetje residence.  (Tr. 1900-02).  Greenwald was then instructed to examine the interior of the residence in search of evidence.  (Tr. 1902-03).  As part of this examination, Greenwald discovered the two receipts on which Petitioner's name was printed.  (Tr. 1908-14).  Greenwald was also involved in the recovery and analysis of electronic information recovered from computers seized from Petitioner, Donna Koetje, and Jay Dolfin.  (Tr. 1914-19).  At trial, Greenwald read for the jury the contents of numerous e-mails that were recovered from the defendants' computers.

On April 6, 1999, Donna Koetje sent to Jay Dolfin an e-mail containing the following comments:

> I was trying to remember how long I have been doing the Paxil and wondering why it's taking so long.  If this does not work, I will have to go with the other plan (does not bother me one bit).  I can't believe that this has been going on since last September.  I am really feeling down in the dumps about it, I thought for sure this time the mission was accomplished.

(Tr. 1933-35).

On April 10, 1999, Donna Koetje sent to Jay Dolfin an e-mail containing the following comments:

> Gerald just looks tired and sleeps quite a bit (real sound.) He also has a funny color.  Maybe all is not lost, only time will tell.  He plans on going for blood work and a urine test next week.  I sometimes wonder how he goes on every day.  To me it is truly amazing the code should have done the work, maybe the Dr. was wrong about the coding process.

(Tr. 1936-37).

Later that same day, Donna Koetje sent another e-mail to her brother, a portion of which read:

> glad to hear that you think things are on a roll.  You are right, it should have occurred months ago.  As for me coming for a week-end, I think I better wait around here until the all clear sign is up.  I don't want anyone to get at the medication, maybe I am really close and don't want to blow the whole thing.

(Tr. 1938-39).

On April 13, 1999, Donna Koetje sent to Jay Dolfin an e-mail containing the following comments:

> Viagra is the next step, Dr. says that will really do it, do you believe her?????  I wonder where you can get it?  I am sure not going to order it over the net.  Maybe we should try the slime DR.  Talk to me on Thursday, should have the news by then.

(Tr. 1942-43).

On April 14, 1999, Donna Koetje sent to Jay Dolfin an e-mail containing the following comments:

> I told you a long time ago that the Dr. said she would not give him Viagra.  She even told me the mix with everything else would take him out.  I don't think the green medication will ever work, if you can get a several V let me know, I won't order any over the net either, too dangerous.

(Tr. 1944-45).

On April 16, 1999, Donna Koetje sent to Jay Dolfin an e-mail containing the following comments:

> Like you said this has been going on for a long time and I am amazed and confused with the results.  In the future, I want a clean concise remedy that will work.  Hope you can get a good link on the Via.

(Tr. 1944-47).

Later that evening, Koetje sent an e-mail to her brother in which she wrote:

> You will find this truly amazing but I talked to Gerald's Dr. today and she said the blood test was not toooo bad. . .She did not seem to concerned.  I am still in shock and will probably have cardiac arrest myself.  I just can't believe the news and am really bummed out that. . .some of the new medication did not work.

(Tr. 1948-49).

On April 18, 1999, Donna Koetje sent an e-mail to her brother the contents of which included the following:

> As to the blood test, I don't believe the Dr. would lie to me, we are on a first name basis.  She wonders how he has held out so long, tonight he was in bed by 7:00.  I am still giving him the medication but feel its a lost cause, what do you think?????  I don't feel the coding made any difference.  He still wants the Viagra and says it's my fault that he can't get it.  Dr. Talmo knows what the Viagra will do that's why she will not give it to him.

(Tr. 1950-52).

On April 19, 1999, Donna Koetje sent to Jay Dolfin an e-mail containing the following comments:

> The Viagra pills are small, can make them smaller.  Can you also get ahold of some extra nitro?  I know along with nitro it will do the trick, ask the Dr. how many should be administered at once?

(Tr. 1955-56).

On April 20, 1999, Jay Dolfin sent an e-mail to Donna Koetje in which she wrote the following:

> pretty sure I found some vigarara from a person i know,
> there selling the stuff on the street.  My friend father takes
> it and he says he can grab two or three pill no sweat.  Also
> have another friend on nitro so will be able to get some of
> those also.

(Tr. 1963-64).

Approximately one hour later, Donna Koetje responded to this e-mail by

writing:

> Thanks for the news, I do believe that will do the trick.  I
> suppose they will have to be combined to make it work, it
> will be done on a Sat. or Sunday when I am home.  At least
> my misery will be over!!!

(Tr. 1964-65).

On April 25, 1999, Koetje sent an e-mail to her brother in which she wrote

the following:

> Gerald just woke up a little while ago with a bad nosebleed.
> . .Do you think the medicine might be working a little bit.

(Tr. 1969-70).

Later that day, Jay Dolfin replied to Koetje's e-mail by writing the

following:

> Yes, I think this stuff is working, it's just working so slow
> it pitiful.   Nosebleeds that's a long way from daisies
> popping up.

(Tr. 1970-71).

On June 21, 1999, Donna Koetje sent an e-mail to Petitioner in which she

wrote the following:

> I wanted to ask you something, do you think the pharmacy
> in Florida is on the safe side.  I know Jay has been trying to
> find out a few things for me.  We got the list from you, is
> that how you order off the list?  Does anyone at home read

> your mail?  I am safe here because I don't have anyone
> who knows how to run it plus I put passwords on
> everything.

(Tr. 1980-82).

On July 12, 1999, Donna Koetje sent to Jay Dolfin an e-mail containing

the following comments:

> I have resigned myself my fact that something has to be
> done no matter what the cost.  It's the only way I can
> survive, I am not too worried about the trust fund.  I know
> they do investing on it, my financial planner told me so
> 10% get invested or more to make you money.  I can easily
> live on what I will get, not tooo worry, nothing can get any
> worse than it already is.  I think this wedding rocked his
> boat, the first thing I will do is borrow off the trust to pay
> off his bills then it will be clear sailing. . .I really get
> nervous when he talks about his big retirement date, he will
> really be doing the stalk act.  If he makes it that long. . .If
> Gerald knew what we were thinking he would kill me.

(Tr. 1995-99).

On July 23, 1999, Donna Koetje sent an e-mail to Jay Dolfin containing

the following comments:

> Yes, your friend and I have been communicating quite a
> bit.  He can be quite a card.  Hope to see you very soon in
> Michigan, take L with you.  You can stay here in the
> condo.

(Tr. 1999-2002).

Later that day, Jay Dolfin responded to this e-mail writing in part:

> Good luck on your doctor's, i think your going to run into
> trouble with one doctor snitching on another, they just
> don't do it that often.  They might tell you he did but he
> will never get on the stand.

(Tr. 2002-04).

On July 27, 1999, Donna Koetje sent an e-mail to Petitioner containing the

following comments:

> Thanks for all the information, you have really helped me out and I do appreciate it.  I always tell Jay that he will be rewarded and so will you. . .Jay says he is going to Vancouver around the 1st of August so I will probably see him after that.  Don't worry, I always read his e-mail's first then yours then I delete them so nobody gets ahold of them.

(Tr. 2004-07).

On August 3, 1999, Petitioner sent an e-mail to Donna Koetje in which he wrote the following:

> It looks like 29 September is the day I will be getting ready to leave for Detroit.  Might not get out until the 30th but will start getting ready on Thursday.  Where is the nearest place I-90 (I think) gets to your home.  I was thinking of maybe giving you a call just to say hi on my wya through.

(Tr. 2007-09).

On August 3, 1999, Donna Koetje sent an e-mail to Petitioner in which she wrote the following:

> Thanks for helping me out with Jay, you are right if Suz opens that letter and finds money in it she will probably have his ass.  He will have to think of something fast.  As to your coming here, my home number is (616) 878-4829. . .Maybe we could have dinner together, I think it would be a lot of fun.

(Tr. 2007-12).

On August 25, 1999, Jay Dolfin send an e-mail to Donna Koetje in which he wrote the following:

> what did you think about my plan??????????????  you will have the stuff in two weeks from today safe and sound, no risk.

(Tr. 2012-13).

That same day, Donna Koetje responded to her brother's e-mail, writing the following:

> Sounds good to me the 9th is on a Thursday.  There is a super 8 right off from 54th street if that sounds good.  I can go pay for it and get the reservations. . .You better Delete this one.  Yes, I think L wants me to come to Wisconsin bad (larf, larf).  Keep me posted.

(Tr. 2014-15).

Later that day, Petitioner sent an e-mail to Donna Koetje in which he wrote the following:

> Do you like to walk in the woods just to get away?  I do and I guess this is my trailer getaway you mentioned you have.  It is really nice to just walk around or sit and be alone.  I cna go up in the tree stand and relax and just watch the woods. . .Like you said, if you want to see the area when you are here I will be happy to show you the stand and the great view of things from it.  I know you will just love the set up.

(Tr. 2015-17).

The following day, Donna Koetje sent the following e-mail to Jay Dolfin:

> Hey, ironjay What is Lloyd really like?

(Tr. 2015).

On August 31, 1999, Donna Koetje sent Jay Dolfin an e-mail containing the following comments:

> Don't worry, I keep it cool with L he just likes to talk to me.  I know you would not get anything from him not too much to trust at that end that's all I can say.

(Tr. 2018-19).

On September 4, 1999, Donna Koetje sent an e-mail to Jay Dolfin in which she wrote the following:

> what night do you want the reservation for (the date).  I will
> take care of everything.  It's all under control, the name
> will remain the same.  Sounds like someone you went to
> high school with.

(Tr. 2029-30).

Later that day, Dolfin replied to Koetje's e-mail, writing the following:

> you are correct, that was one of my old high school pals. .
> .A name like that you never forget which is the best part.  A
> Ill. license number would be good but the main thing is pay
> in cash. . .I guess Grandma DaHaan has got one foot in the
> grave and any other on a banana peel.  All brown and
> jaundice, that's how Gerald would look if this all played
> out.

(Tr. 2030-31).

On September 8, 1999, Donna Koetje sent to Petitioner an e-mail
containing the following comments:

> I will tell Jay tomorrow night that it's in the mail.  I am
> taking him out for dinner in K'zoo.

(Tr. 2051-52).

On September 12, 1999, Donna Koetje sent an e-mail to Petitioner in
which she wrote the following:

> Yes, I did take Jay out to Applebee's for dinner on
> Thursday night. . .When you leave on the 30th, I will check
> my work schedule and maybe we can meet half-way.

(Tr. 2053-55).

On September 13, 1999, Jay Dolfin sent an e-mail to Petitioner in which
he wrote the following:

> roger dodger lima charlie okie dokie, so you don't think the
> sis' will do the deed.  she was supposed to do it today but
> have heard nothing.  my money on yes.  she been hassled
> and abused to much, no were to go.  desprite people do

> desprite things, time will tell.  Glad the blue's came in – i'll
> try one wednesday to check them out.

(Tr. 2057-58).

On September 13, 1999, Donna Koetje sent an e-mail to Jay Dolfin

containing the following comments:

> Gerald apparently worked all day and when I got home
> from the dentist he was sitting in his chair and just said he
> had a few chest pains (nothing a tums would not cure).
> Can you believe it?  I don't want to have to go through this
> again.

(Tr. 2059-60).

Later that day, Donna Koetje sent her brother another e-mail in which she

wrote the following:

> He is up and running around like nothing has happened.  I
> am totally amazed and frustrated. . .Help is more in the
> picture, maybe I will have to get L to do some work.

(Tr. 2061).

Jay Dolfin responded to this e-mail later that night, writing, "keep at it,

must have got a dud."  (Tr. 2061-62).  On September 14, 1999, Donna Koetje sent an e-

mail to Jay Dolfin containing the following comments:

> I was under the understanding that the new Paxil would
> work real quick.  He will be taking extra medication every
> day.

(Tr. 2066-67).

Later that day, Donna Koetje sent an e-mail to Jay Dolfin in which she

wrote the following:

> If you think you are confused what do you think I
> am??????  I am on day three with the new Paxil and have
> not noticed any difference.  Are you sure that is the right

> medication the Dr. should be using.  I hate to try anything
> else, I am at my wits end.

(Tr. 2067-68).

On September 15, 1999, Donna Koetje sent an e-mail to Petitioner

containing the following comments:

> Lloyd, another big favor to ask of you, call Jay and tell him
> I will be on-line a midnight tonight (Wednesday).  Tell him
> I need to speak with him ASAP.

(Tr. 2068-69).

The following morning, Jay Dolfin sent an e-mail to Donna Koetje in

which he wrote the following:

> I am at a loss here, it works on everyone else.  We will
> maybe try the direct approach.

(Tr. 2070-71).

On September 16, 1999, Donna Koetje sent an e-mail to Jay Dolfin

containing the following comments:

> How do you think the direct approach would work, time is
> running out.

(Tr. 2074-75).

Later that evening, Jay Dolfin sent an e-mail to Donna Koetje in which he

wrote the following:

> cannot figure out why it doesn't work.  a women here gave
> her 46 man only 2, bit the dust in less than 15 minute's. . .It
> was his idea to take them because she was laughing at him
> that he couldn't get it up, hospital couldn't even save him.
> The direct approach is wam bamb, two above the ear your
> choice, think about it.

(Tr. 2075-76).

Two minutes later, Donna Koetje responded to this e-mail, writing:

> I believe the best course of action now is the direct approach. Can't live like this any longer.

(Tr. 2077).

On September 17, 1999, Donna Koetje sent an e-mail to Jay Dolfin containing the following comments:

> Will see what happens over the week end, then the troops will be called in.

(Tr. 2077-78).

On September 19, 1999, Donna Koetje sent an e-mail to Jay Dolfin containing the following comments:

> The direct approach will be next, I will fill you in on the details.

(Tr. 2087-89).

On September 20, 1999, Jay Dolfin sent Donna Koetje an e-mail in which he wrote the following:

> I do not know why you are having such bad luck. The first time you did it, it should have worked. I tried one to see if they worked and my dick was hard for about three hours, it hurt. They are the real maccoy. . .i was thinking, maybe you should have made him dinner and dumped all 20 in the gravey.

(Tr. 2097-98).

On September 22, 1999, Donna Koetje sent an e-mail to Jay Dolfin containing the following comments:

> Got the e-mail from L he said he was coming on the 30th.

(Tr. 2105-06).

Later that day, Jay Dolfin responded by sending to Donna Koetje an e-mail in which he commented that:

> Lloyd is the one to ask about the quick approach also. He done some work in that department also, can't say anymore about it.

(Tr. 2106-07).

On September 22, 1999, Petitioner sent an e-mail to Donna Koetje in which he wrote the following:

> I decided to sned an older pix of me so you know who you will be having dinner with. . .next week.

(Tr. 2108).

On September 23, 1999, Donna Koetje responded to Petitioner's e-mail by writing:

> Very nice picture, am anxious to meet you. . .I asked Jay to discuss something with you so I want you to be careful about your decision. . .Jay said he would trust you with his life and I KNOW HE would not say it unless he believed it.

(Tr. 2110-11).

The following day, Petitioner sent an e-mail to Donna Koetje in which he wrote the following:

> I am fairly sure I know what Jay is going to talk to me about. I will wait til I see you to discuss this since I don't think the computer is the proper place to discuss it. The only thing I will say is that I have have already started to give it a lot of thought to start making the necessary arrangements.

(Tr. 2113-15).

On September 27, 1999, Donna Koetje sent an e-mail to Petitioner containing the following comments:

> Just heard from Jay that he is at home sick with the flu.  I am glad he had a little time to talk with you about my problem.  I will be checking my mail tomorrow night. . .by then, you should know where we can meet on Thursday.

(Tr. 2120-21).

On September 28, 1999, Donna Koetje sent an e-mail to Petitioner in which she wrote the following:

> Here is the scope on the way to Kalamazoo go East on Highway 43.   Exit at 38, after you exit to the right Applebees is on the left. . .I will. . .arrive at Applebees pretty close to 4:00. . .The chances of us seeing anyone I know are next to none.

(Tr. 2123-26).

On September 29, 1999, Jay Dolfin sent an e-mail to Petitioner in which he wrote the following:

> Hey pal, take 90 east to 290 east to the tri-state 294 which shoots you out on I 80 and I 90 or 94 (forgot), once your on 80 east it's about 17 miles to 94 east, signs say Detroit.  When you get near Kalamazoo look for 131 north and take that (very tricky) go slow for that one.  It's the 2 exit I think M43, go right, through the light on the left.

> Hour and a half to get out of Wisconsin, 3 to 4 hours to get past Gary, Ind two hours or less to Kalamazoo.  Kalamazoo 363 miles from my house.  8 tolls i think 40 cents have the right change, it will safe lots of time.  A quarter dime and nickel or five pennies is all it takes.

> on the way to Kalamazoo i remember a sign that says Detroit 294 miles so you got a cruise.  Cheap hotels in Kalamazoo, give Ma & Pa a call if you like.  have fun pal – any questions???  coming back just follow the signs for 80 WEST, hook up to 294 and follow the signs to Rockford.  have a gas, later, Jay.

(Tr. 2131-33).

Later that same day, Dolfin sent an e-mail to Donna Koetje in which he

45

wrote the following:

> I talked to l tonight and everything is in order. . .It will be done. . .If it's a 'go' it will be done quickly, two to three weeks.

(Tr. 2137-39).

On October 3, 1999, Donna Koetje sent an e-mail to Petitioner in which she wrote the following:

> How did things go over the weekend?  Did you try out your new equipment?  Actually, I was very impressed with your set-up. #1 You are smart  #2 Cautious  #3 Serious  #4 I feel as though I can trust you.

(Tr. 2143-46).

Later that day, Donna Koetje sent Petitioner another e-mail that included the following comments:

> Just checked my schedule, will be flying to Richmond on October 21 at noon and am scheduled to come back on Sunday at 7:42.  Since you are the genius, I will leave the time up to you. . .Was just wondering if anyone would wonder why it happened when I was gone.

(Tr. 2146-47).

On October 4, 1999, Donna Koetje sent an e-mail to Petitioner, the contents of which included the following:

> Yes, we did have a good time and I was glad to finally meet the man behind the screen. . .You never know who to trust and after having a brother like Jay, you get suspicious he gets paranoid over every little thing.  I guess if I were in his spot, I would be the same way no-one wants to go back to the jail-house rock.

(Tr. 2147-49).

On October 6, 1999, Petitioner sent to Donna Koetje an e-mail in which he

wrote the following:

> I had a little talk with Jay tonight and we decided that it
> would probably be a good idea to delete everything about
> me and we can send messages through Jay. . .Since this
> might be the last direct message from me for a while I
> thought I would let you know that everyone is ready.  I
> managed to cover all the arrangements and the up front has
> been issued to cover needed things. . .The other thing is to
> LISTEN TO JAY, don't talk to anyone without your
> attorney to avoid getting tripped up.

(Tr. 2152-54).

On October 17, 1999, Jay Dolfin sent an e-mail to Donna Koetje in which

he wrote the following:

> That's why I want to have you get a payphone number so I
> can buy a calling card and let him use it to talk to you.  He
> wants a layout of the place and he's got a better idea he
> thinks. . .It's better if you talk directly to him so you can
> get everything straight and everyone is a ease with the
> program.

(Tr. 2167-68).

On October 18, 1999, Donna Koetje sent an e-mail to Jay Dolfin which

included the following:

> Would it be easier for me to get the card and call him?. .
> .All the phones I looked at the day would NOT accept
> incoming calls,

(Tr. 2169-71).

Dolfin responded to this message the same by sending Koetje an e-mail in

which he wrote the following:

> I will talk to him today to see if you can call him at work.
> If you do make sure you go buy a calling card.  That way
> the call will not be on your phone bill incase they look at
> you and my phone bill after it's over.

(Tr. 2171-72).

        Later that same day, Dolfin sent Koetje another e-mail in which he wrote the following:

> I also gave him the number to the hotel in case he has to
> work out any final stuff.

(Tr. 2175-76).

        On October 19, 1999, Jay Dolfin sent an e-mail to Petitioner in which he wrote the following:

> Hey pal donna thought you were going to call her last night
> i think she wrote me a email cause i told her you would call
> and work out details.

(Tr. 2178-79).

        On October 20, 1999, Donna Koetje sent an e-mail to Jay Dolfin containing the following comments:

> I will be at the Crown Plaza 1-804-788-0900 in Richmond,
> VA in case anything happens.

(Tr. 2180).

        After considering the evidence, the jury found Petitioner guilty of first-degree murder and conspiracy to commit first-degree murder.  (Trial Transcript, March 28, 2001, 13).  The jury also found Petitioner guilty of possession of a firearm during the commission of a felony, but acquitted him of first-degree home invasion.  *Id.*  Petitioner was sentenced to life in prison without the possibility of parole.  (Sentencing Transcript, April 25, 2001, 13-14).  On the conspiracy conviction, Petitioner was sentenced to life in prison.  *Id.* at 14.  Finally, Petitioner was sentenced to two years in prison for possessing a firearm during the commission of a felony.  *Id.*  Petitioner appealed the matter to the

Michigan Court of Appeals.  On December 18, 2001, Petitioner's appellate counsel

submitted a brief on appeal in which he asserted the following claims:

> I.    There was insufficient evidence to sustain a verdict on all charges.
>
> II.   The police violated Defendant's right against unlawful search and seizure when they expanded their search of Defendant's property well beyond the scope of the search warrant.  This resulted in the admission of illegally seized evidence at trial and manifest injustice to Defendant.
>
> III.  The pretrial publicity throughout Kent County arising out of the killing of Gerald Koetje was so immediate, pervasive and prejudicial that a presumption of prejudice should have been presumed and the trial court should have ordered a change of venue.  The failure of the court to do so sua sponte resulted in manifest injustice to Defendant.
>
> IV.   Defendant was rendered the ineffective assistance of counsel and a fair trial as a result of defense counsel's failure to file pretrial motions to change venue and to suppress the evidence.

On April 22, 2003, Petitioner (still represented by counsel) submitted to

the Michigan Court of Appeal a pro se "supplemental brief of appeal" in which he

asserted the following claims:

> I.    Did the investigating officers violate Mr. Riddle's Fourth Amendment right to be free from unreasonable searches and seizures when they searched his home on the presumed authority of a search warrant which was invalidated due to their insufficient showing of probable cause?

II.    Because the search warrant was invalidated due to an insufficient showing of probable cause, did the Fourth Amendment require that the evidence seized pursuant to that warrant should have been suppressed, and where it was not, did its admission at trial violate Mr. Riddle's Fifth and Fourteenth Amendment right to due process of law and a fair trial?

III.    Did the investigating officers violate Mr. Riddle's Fourth Amendment right to be free from unreasonable searches and seizures when they searched his home without presenting a copy of the search warrant to the occupant-owner therein, and entered the occupied home without first knocking and/or announcing their presence or purpose?

IV.    Because the search of Mr. Riddle's home was conducted in violation of the "knock-and-announce" rule, did the Fourth Amendment require that the evidence seized pursuant to that search should have been suppressed, and where it was not, did its admission at trial violate Mr. Riddle's Fifth and Fourteenth Amendment right to due process of law and a fair trial?

V.    Was Mr. Riddle denied his Sixth Amendment right of confrontation, and his right to a fair trial, when the trial court refused to sever the trial, and then permitted the prosecution to introduce the alleged statements of co-defendants without providing Mr. Riddle an opportunity to cross-examine or otherwise challenge those statements?

VI.    Were Mr. Riddle's Sixth Amendment right to effective assistance of counsel, and thus his right to a fair trial, violated by defense counsel's failure to conduct any meaningful investigation prior to trial; failure to file

meaningful and necessary pretrial motions; failure to inform Defendant of his rights and options; failure to utilize available defenses at trial; and the cumulative effect of these errors?

In a decision dated April 29, 2003, the Michigan Court of Appeals denied Petitioner's appeal. *People v. Riddle*, No. 234452, Opinion (Mich. Ct. App., April 29, 2003). In its decision the court did not address the issues raised by Petitioner in his pro se supplemental brief. *Id.* On May 13, 2003, Petitioner moved in the Michigan Court of Appeals for rehearing on the ground that the court failed to address the issues asserted in his pro se supplemental brief. The court denied Petitioner's motion for rehearing. *People v. Riddle*, No. 234453, Order (Mich. Ct. App., June 12, 2003). Asserting the following claims, Petitioner then moved in the Michigan Supreme Court for leave to appeal:

I.     My 4th Amendment rights to expectation of protection from unreasonable search and seizure was violated when my residence was searched with no valid reason given for the search or the items being looked for would be located at my residence.

II.    The officers violated my 4th Amendment rights against unreasonable search and seizure when they searched my residence without presenting a copy of the search warrant and entry was made without them knocking and/or announcing their presence or purpose.

III.   Did the investigating officers violate Mr. Riddle's Fourth Amendment right to be free from unreasonable searches and seizures when they searched his home on the presumed authority of a search warrant which was invalidated due to their insufficient showing of probable cause?

51

IV.   Because the search warrant was invalidated due to an insufficient showing of probable cause, did the Fourth Amendment require that the evidence seized pursuant to that warrant should have been suppressed, and where it was not, did its admission at trial violate Mr. Riddle's Fifth and Fourteenth Amendment right to due process of law and a fair trial?

V.    Did the investigating officers violate Mr. Riddle's Fourth Amendment right to be free from unreasonable searches and seizures when they searched his home without presenting a copy of the search warrant to the occupant-owner therein, and entered the occupied home without first knocking and/or announcing their presence or purpose?

VI.   Because the search of Mr. Riddle's home was conducted in violation of the "knock-and-announce" rule, did the Fourth Amendment require that the evidence seized pursuant to that search should have been suppressed, and where it was not, did its admission at trial violate Mr. Riddle's Fifth and Fourteenth Amendment right to due process of law and a fair trial?

VII.  Was Mr. Riddle denied his Sixth Amendment right of confrontation, and his right to a fair trial, when the trial court refused to sever the trial, and then permitted the prosecution to introduce the alleged statements of co-defendants without providing Mr. Riddle an opportunity to cross-examine or otherwise challenge those statements?

VIII. Were Mr. Riddle's Sixth Amendment right to effective assistance of counsel, and thus his right to a fair trial, violated by defense counsel's failure to conduct any meaningful investigation prior to trial; failure to file meaningful and necessary pretrial motions;

failure to inform Defendant of his rights and options; failure to utilize available defenses at trial; and the cumulative effect of these errors?

IX.     My 6th Amendment rights were violated when the court refused to sever the trials and then permitted the prosecution to introduce alleged statements of co-defendants without providing an opportunity to cross-examine or challenge these statements.

X.      My 6th Amendment right to effective assistance of counsel was violated when defense counsel failed to conduct a meaningful investigation or file pretrial motions or advise me of my rights and options, and to utilize available defenses at trial.

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Riddle*, No. 124384, Order (Mich., Nov. 24, 2003).  On October 21, 2004, Petitioner submitted the present petition for writ of habeas corpus in which he asserts the following claims:

I.      Was there insufficient evidence to sustain a verdict on all charges?

II.     Was the pretrial publicity throughout Kent County arising out of the killing of Gerald Koetje so immediate, pervasive and prejudicial that a presumption of prejudice should have been presumed and should the trial court have ordered a change of venue? Did the failure of the court to do so sua sponte result in manifest injustice to Petitioner?

III.    Was Mr. Riddle denied his Sixth Amendment right of confrontation, and his right to a fair trial, when the trial court

refused to sever the trial, and then permitted the prosecution to introduce the alleged statements of co-defendants without providing Mr. Riddle an opportunity to cross-examine or otherwise challenge those statements?

IV.    Did the police violate Petitioner's right against unlawful search and seizure when they expanded their search of Mr. Riddle's property well beyond the scope of the search warrant?  Did this result in the admission of illegally seized evidence at trial and manifest injustice to Petitioner?

V.    Did the investigating officers violate Mr. Riddle's Fourth Amendment right to be free from unreasonable searches and seizures when they searched his home on the presumed authority of a search warrant which was invalidated due to their insufficient showing of probable cause?

VI.    Because the search warrant was invalidated due to an insufficient showing of probable cause, did the Fourth Amendment require that the evidence seized pursuant to that warrant should have been suppressed, and where it was not, did its admission at trial violate Mr. Riddle's Fifth and Fourteenth Amendment right to due process of law and a fair trial?

VII.    Did investigating officers violate Mr. Riddle's Fourth Amendment right to be free from unreasonable searches and seizures when they searched his home without presenting a copy of the search warrant to the occupant-owner therein, and entered the occupied home without first knocking and/or announcing their presence or purpose?

VIII.    Because the search of Mr. Riddle's home was conducted in violation of the "knock-and-announce" rule, did the Fourth

Amendment require that the evidence seized pursuant to that search should have been suppressed, and where it was not, did its admission at trial violate Mr. Riddle's Fifth and Fourteenth Amendment right to due process of law and a fair trial?

IX.    Was Defendant rendered the ineffective assistance of counsel and a fair trial as a result of defense counsel's failure to file pretrial motions to change venue and to suppress the evidence?

X.    Were Mr. Riddle's Sixth Amendment right to effective assistance of counsel, and thus his right to a fair trial, violated by defense counsel's failure to conduct any meaningful investigation prior to trial; failure to file meaningful and necessary pretrial motions; failure to inform Defendant of his rights and options; failure to utilize available defenses at trial; and the cumulative effect of these errors?

## **STANDARD OF REVIEW**

Riddle's petition, filed October 21, 2004, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of,

> clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."   *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."   *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists."   *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).   The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's

jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority.  The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law.  *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct.  *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. ß 2254(e)(1)).

Petitioner can rebut this presumption only by clear and convincing evidence.  *Id.*

The deferential standard articulated by the AEDPA, however, does not apply if the state has failed altogether to review a particular claim.  As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  In such circumstances, the court conducts a *de novo* review.  *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.        Exhaustion**

Respondent asserts that "Petitioner's third and tenth habeas claims were never 'fairly presented' to the state courts in a manner that satisfies the [habeas] exhaustion requirement."  The Court disagrees.  A federal court cannot grant relief in a habeas action unless the petitioner has first exhausted his state court remedies.  *See* 28 U.S.C. § 2254(b)(1)(A).  To satisfy this requirement, the petitioner must afford the state courts an *opportunity* to address the claims on which his request for habeas relief is based.  *See Wilson v. Mitchell*, 498 F.3d 491, 498-99 (6th Cir. 2007).

As detailed above, the third and tenth claims asserted in Riddle's petition for writ of habeas corpus were presented to the Michigan Court of Appeals in Petitioner's pro se "supplemental brief of appeal."  Petitioner's "brief of appeal" was accepted for filing, as Respondent acknowledges.  Respondent nonetheless deems it significant that

the court of appeals "chose not to consider the issues raised in" Petitioner's pro se brief. However, the issue is not whether the court chose to address these particular claims, but instead whether the court was given the *opportunity* to examine such claims.  The Michigan Court of Appeals was afforded the opportunity to address these claims.  The Michigan Supreme Court was likewise given the opportunity to address these claims when Petitioner appealed the decision of the Michigan Court of Appeals.  The Court concludes, therefore, that Petitioner has properly exhausted the third and tenth claims asserted in his petition for writ of habeas corpus.

The Court previously determined, however, that Petitioner had, in fact, failed to properly exhaust the first, second, and fourth claims asserted in his petition for habeas relief.  (Dkt. # 47).  The Court twice issued to Petitioner Orders to Show Cause instructing him that if he wanted the Court to consider his unexhausted claims he must demonstrate that he was entitled to a stay so that he could return to state court and exhaust these claims.  (Dkt. #47 and #49).  Petitioner was further instructed that he could, in the alternative, file an amended petition for writ of habeas corpus asserting only those claims that have been properly exhausted.  *Id.*

In response to the Court's Orders to Show Cause, Petitioner has asserted that he has properly exhausted all the claims asserted in his petition for writ of habeas corpus.  The Court has again examined whether Petitioner has properly exhausted the first, second, and fourth claims asserted in his habeas petition.  Upon review, the Court concludes that Petitioner has properly exhausted his fourth habeas claim.  There is no question that Petitioner presented this issue to the Michigan Court of Appeals, the question is whether this claim was presented to the Michigan Supreme Court.  While not

artfully worded, Petitioner's application for leave to appeal filed in the Michigan Supreme Court sufficiently asserts the claim that police officers searched areas of his property not authorized by the search warrants.

With respect to the first and second claims asserted in Riddle's petition for writ of habeas corpus, the Court again concludes, however, that such claims have not been properly exhausted.  While Petitioner presented these claims to the Michigan Court of Appeals, they were never presented to the Michigan Supreme Court. Petitioner's application for leave to appeal (filed in the Michigan Supreme Court) makes absolutely no mention of these particular claims.  Petitioner's failure to exhaust notwithstanding, the Court has addressed these two claims on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

## II.        **Sufficiency of the Evidence Claim**  (Habeas Claim I)

Petitioner asserts that he is entitled to habeas relief because "the evidence presented by the Prosecutor falls short of establishing that Mr. Riddle committed any offense."   Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See* *O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).   Furthermore, where the record supports conflicting inferences the Court "must

presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Under Michigan law in effect as of the date Petitioner committed the acts for which he was convicted, the elements of first-degree murder were: (1) the defendant intentionally killed the victim, and (2) the act of killing was premeditated and deliberate. *See People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992). Premeditation and deliberation require "sufficient time to allow the defendant to take a second look." *Id.* The elements of first-degree murder "may be inferred from all the facts and circumstances surrounding the incident." *People v. Haywood*, 530 N.W.2d 497, 503 (Mich. Ct. App. 1995) (premeditation and deliberation may be inferred from circumstances); *People v. Price*, 1997 WL 33353593 at *1 (Mich. Ct. App., Mar. 7, 1997) (intent may be inferred from circumstances) (citing *People v. Safiedine*, 414 N.W.2d 143 (Mich. Ct. App. 1987)). Moreover, intent to kill may be inferred from the use of a lethal weapon or "from conduct the natural tendency of which is to cause death or great bodily harm." *See Price*, 1997 WL 33353593 at *1 (citing *People v. Ray*, 224 N.W.2d 735 (1974)).

A conspiracy was defined as a "mutual agreement or understanding, express or implied, between two or more persons to commit a criminal act or to accomplish a legal act by unlawful means." *People v. Cotton*, 478 N.W.2d 681, 688 (Mich. Ct. App. 1991). The crime of conspiracy is "complete upon the formation of the agreement." *Id.* at 689. Conspiracy is a specific intent crime; therefore, the prosecution must establish "both the intent to combine with others and the intent to accomplish the

illegal objective." *Id.* at 688.

The prosecution is not required, however, to present direct evidence of an agreement or establish that the agreement was "formal" in nature. The existence of the agreement may be established by "the circumstances, acts, and conduct of the parties." *Id.* Moreover, the existence of a conspiracy may be proven by "circumstantial evidence or may be based on inference." *Id.* at 688-89. To establish the existence of a conspiracy to commit murder, the prosecution must establish "that each of the conspirators [had] the intent required for murder" and that there existed "foreknowledge of that intent." *People v. Hamp*. 312 N.W.2d 175, 180 (Mich. Ct. App. 1981).

Finally, to be convicted of possessing a firearm during the commission of a felony, the prosecution had to establish that the defendant carried or had in his possession a firearm at the time he committed or attempted to commit a felony. Mich. Comp. Laws § 750.227b (1999).

Interpreted pursuant to the appropriate standard, the evidence presented at trial established that Donna Koetje and Jay Dolfin initially attempted to kill Gerald Koetje through the administration of lethal dosages of various prescription medications. When these efforts proved unsuccessful, Koetje and Dolfin enlisted Petitioner's assistance, after which the three entered into a conspiracy to murder Gerald Koetje. The evidence that Petitioner killed Gerald Koetje by shooting him in the head was simply overwhelming. A reasonable juror, therefore, could certainly have found Petitioner guilty beyond a reasonable doubt of conspiracy to commit murder, first-degree murder, and possession of a firearm during the commission of a felony.

With respect to this particular claim, the Michigan Court of Appeals

concluded that, "[v]iewing the evidence in a light most favorable to the prosecution, a rational trier of fact could find that the essential elements of the crimes were proven beyond a reasonable doubt." *People v. Riddle*, No. 234452, Opinion at 14 (Mich. Ct. App., April 29, 2003). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**Pretrial Publicity Claim** (Habeas Claim II)

Petitioner asserts that "the pretrial publicity throughout Kent County arising out of the killing of Gerald Koetje was so immediate, pervasive and prejudicial that a presumption of prejudice should have been presumed and the trial court should have ordered a change of venue." The Court notes that Petitioner never requested a change of venue in this matter.

Every criminal defendant is entitled to fair trial before an impartial jury and where pretrial publicity jeopardizes this right, the trial court should grant the defendant a change in venue. *See Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). Prejudice resulting from pretrial publicity is characterized as presumptive or actual. Pretrial publicity is presumptively prejudicial "where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community." Such circumstances "rarely" occur.

Where pretrial publicity is not presumptively prejudicial, the trial court

must determine whether such publicity nonetheless results in actual prejudice.   The "primary tool" for uncovering actual prejudice is voir dire of prospective jurors.   Negative media coverage does not by itself result in actual prejudice.   Moreover, the mere fact that a potential juror possessed a preconceived notion as to the defendant's guilt or innocence is by itself insufficient to establish actual prejudice.   Rather, the relevant question is "did the juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."   *Id.*

In support of his argument, Petitioner has identified six very brief (and largely redundant) articles the contents of which he claims denied him of the right to a fair trial.   (Dkt. #3, Exhibits E1-E4 and E6-E7).   Four of these articles were published in the Detroit News.   One was published in The Michigan Daily and another was published in the Milwaukee Journal Sentinel.

These articles consist of: (1) factual statements about Petitioner and his two co-defendants; (2) factual statements concerning the investigation into Gerald Koetje's murder; (3) factual statements regarding the prosecution of Petitioner and his two co-defendants; (4) descriptions of testimony offered at preliminary proceedings; (5) non-inflammatory statements by the prosecuting attorney concerning his theory of the case; and (6) statements by the attorneys representing Donna Koetje and Jay Dolfin concerning the alleged weakness of the case against their respective clients.

Petitioner has presented no evidence that his trial occurred in an "inflammatory, circus-like atmosphere."   Moreover, the contents of these articles cannot reasonably be characterized as creating or contributing to such an atmosphere.   Thus,

Petitioner has failed to demonstrate that the pretrial publicity in this matter was presumptively prejudicial. As for whether Petitioner suffered actual prejudice as a result of pretrial publicity, a review of the trial court's voir dire process clearly reveals that such was not the case.

The question of pretrial publicity was addressed during voir dire of Petitioner's jury. At one point in the voir dire process a prospective juror stated that he had noticed "something in the Sunday paper" regarding the trial. (Voir Dire Transcript, February 27, 2001, 53-54). The juror reported that he "saw the headlines," but "didn't see anything specific." *Id.* at 54. In response, the prospective jurors were all asked whether anyone "has any preconceived, formed opinions about this case at this point in time," to which the jurors responded, "no." *Id.* The prospective jurors were later asked "is there anyone who can't be a fair and impartial juror?" *Id.* at 80. The jurors all responded that they were able to be fair and impartial. *Id.* at 80-82. There is nothing in the record that casts doubt on the jurors' assertions that they could act fairly and impartially in this matter. At the conclusion of the jury selection process, the trial court reminded the jurors to:

> Ignore any media coverage. I'm confident that there will be media coverage, probably TV and newspaper, so please ignore that. I think some of you referred to the article in the Grand Rapids Press last night, which was, fortunately, fairly innocuous. Don't even look at anything like that, anything that anything to do with this case, ignore it. Your friends can save it and you can read it in April sometime. So, please, ignore any media coverage, whether it's TV or newspapers, or whatever, radio. If it comes on TV, leave the room, turn it off, whatever.

*Id.* at 127.

In sum, the record contains no evidence from which it can reasonably be

concluded that the jurors in this matter were unable or failed to fairly and impartially examine the evidence in this matter.  Thus, the Court finds no basis for Petitioner's assertion that his right to a fair trial was denied by the trial court's failure to *sua sponte* order a change in venue.  The Michigan Court of Appeals rejected this particular claim, concluding that "[a] review of the jury voir dire shows that the jurors, save one, had not even heard of the parties or the case prior to trial, and the single juror's exposure was minimal without recollection of anything specific."  *People v. Riddle*, No. 234452, Opinion at 15-16 (Mich. Ct. App., April 29, 2003).  Accordingly, the court concluded that Petitioner "has failed to demonstrate that his trial was fundamentally unfair."  *Id.* at 16.  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

IV.          **Confrontation Clause Claim**  (Habeas Claim III)

Petitioner asserts that the admission at trial of various hearsay statements allegedly made by Donna Koetje and Jay Dolfin deprived him of his Sixth Amendment right to confront the witnesses against him because he was unable to cross-examine Dolfin or Koetje regarding such statements.   Specifically, Petitioner challenges the admission of the following testimony:

> I.      Detective Erlandson's testimony regarding the
> following comments allegedly made to her by
> Donna Koetje: (a) that Gerald Koetje "took a

medication which makes him sleep real sound" (Tr. 492); (b) that the ring found in Gerald Koetje's truck "normally would have been on top of the dresser" (Tr. 493); and (c) that Donna Koetje "did not remember if she received any drugs in the mail from Lloyd." (Tr. 492, 493, 516).

II.     Detective Erlandson's testimony that when she asked Donna Koetje "if the name of Lloyd Riddle meant anything to her," Koetje responded that "the name meant nothing to her." (Tr. 492).

III.    Detective Erlandson's testimony that Donna Koetje later "stated that she did know the name [Lloyd Riddle], but she did not know him." (Tr. 514).

IV.     Detective Peters' testimony that Donna Koetje told him that she wished that she had never met Petitioner. (Tr. 1995).

V.      Detective Peters' testimony that Donna Koetje told him that after meeting with Petitioner in Kalamazoo, her only contact with Petitioner was via e-mail. (Tr. 1126-27).

VI.     Detective Peters' testimony that Jay Dolfin informed him that Petitioner was employed at the Madison Area Technical College and a Phillips 66 gas station. (Tr. 1169).

VII.    Detective Self's testimony regarding the following comments allegedly made to him by Jay Dolfin: (a) that his relationship with Gerald Koetje "was strained, frosty;" (b) that "he had" been inside the Koetje residence prior to Gerald Koetje's murder; (c) that Petitioner was his "friend;" and (d) that Petitioner and Donna Koetje "did not know each other," but that "they may have communicated" via e-mail. (Tr. 1652, 1653, 1655, 1658-59).

VIII.   Detective Self's testimony that during his questioning of Jay Dolfin the two discussed alleged drug transactions between Petitioner, Donna Koetje, and Diane Thompson. (Tr. 1698).

IX.     Ralph Zielinski's testimony that he observed a piece of paper given to Petitioner by Jay Dolfin on which the words "Koetje," "Byron Center," and "I-96" were written. (Tr. 612-15).

Initially, it must be noted that the portion of Ralph Zielinski's testimony that Petitioner finds objectionable does not contain hearsay.  Zielinski did not testify

67

concerning statements made by somebody else, rather he testified to what he *observed*. Petitioner cross-examined Zielinski about these alleged observations. Thus, Petitioner's Confrontation Clause rights are not implicated by this particular testimony. As for the remaining testimony that Petitioner finds objectionable, such does not merit habeas relief.

The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right. . .to be confronted with the witnesses against him." U.S. Const. amend. VI. This provision is applicable to the states through the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. 400, 403 (1965). Interpreted literally, the Sixth Amendment's Confrontation Clause appears to preclude the admission of any statement made by a declarant who fails to testify at trial. In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court addressed "the relationship between the Confrontation Clause and the hearsay rule with its many exceptions." *Id.* at 62.

While the Court rejected a literal interpretation of the Confrontation Clause as "unintended and too extreme," the Court nonetheless recognized that the Confrontation Clause "was intended to exclude some hearsay." *Id.* at 63. The Court recognized that "the Confrontation Clause reflects a preference for face-to-face confrontation at trial," while also acknowledging that "competing interests, if closely examined, may warrant dispensing with confrontation at trial." *Id.* at 63-64. In an attempt to balance these competing interests, the Court articulated the following standard:

> [W]hen a hearsay declarant is not present for cross-examination, at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a

> case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* at 66.

The Court reaffirmed this standard on subsequent occasions.  *See, e.g., Idaho v. Wright*, 497 U.S. 805 (1990); *Lilly v. Virginia*, 527 U.S. 116 (1999).  In 2004, however, the Court revisited this issue.  In *Crawford v. Washington*, 541 U.S. 36 (2004), the Court rejected the *Roberts* standard, concluding instead that testimonial statements of absent declarants are admissible under the Confrontation Clause only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.  *Id.* at 42-69.   However, the *Crawford* decision was issued on March 8, 2004, after Petitioner's conviction became final.  The Supreme Court has since declared, however, that its *Crawford* decision does not apply retroactively to convictions that were final prior to its issuance.  *See Whorton v. Bockting*, 127 S.Ct. 1173, 1181-84 (2007).  Thus, the standard applicable to Petitioner's Confrontation Clause claim is that articulated by the Supreme Court in *Ohio v. Roberts* and its pre-*Crawford* progeny.

At trial, Petitioner did not object to the admission of the statements at issue.  The Court can only speculate, therefore, whether the trial court would have found the statements sufficiently reliable such that their admission did not violate Petitioner's right to confront the witnesses against him.  While Petitioner asserted this issue on appeal, the Michigan appellate courts did not address this particular issue.  The Court need not undertake this analysis, however, because even if the Court assumes that admission of the challenged statements violated Petitioner's Confrontation Clause rights, any such violation was clearly harmless.

On habeas review, Confrontation Clause violations are considered harmless unless the violation "had a substantial and injurious effect or influence in determining the jury's verdict." *Calvert v. Wilson*, 288 F.3d 823, 833 (6th Cir. 2002) (quoting *Brecht v. Abrahamson*, 507 U.S. 619 (1993)). This standard requires Petitioner to demonstrate that he suffered "actual prejudice" as a result of the alleged violation of his Confrontation Clause rights. *Ford v. Curtis*, 277 F.3d 806, 809 (6th Cir. 2002) (quoting *Brecht*, 507 U.S. at 637). Petitioner can make no such showing.

The challenged statements do not directly inculpate Petitioner and, in fact, most either exculpate Petitioner or support his contention that he was not involved in Gerald Koetje's killing. On the other hand, the direct evidence of Petitioner's guilt in this matter is absolutely overwhelming. The Court concludes, therefore, that even if Petitioner's Confrontation Clause rights were violated, such error was harmless. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**V.        Fourth Amendment Claims** (Habeas Claims IV through VIII)

Petitioner asserts several violations of his Fourth Amendment right to be free from unreasonable searches and seizures. Petitioner claims that the officers who searched his property "expanded their search of [his] property well beyond the scope of the search warrant." Petitioner asserts that his constitutional rights were violated because there did not exist probable cause to search his property. Petitioner argues that his constitutional rights were further violated when the officers executing the search on his property failed to present a copy of the search warrant to the occupant therein. Finally, Petitioner asserts that the authorities failed to properly knock and announce their presence

before entering his property and executing the search thereof.  Thus, Petitioner claims that he was convicted on the basis of illegally seized evidence that should have been suppressed at trial.  Fourth Amendment claims such as this, however, are not cognizable in habeas corpus cases.  *See Stone v. Powell*, 428 U.S. 465, 481-82 (1976).

In *Stone*, the Court held that so long as the State provided the petitioner with an opportunity for "full and fair" litigation of his Fourth Amendment claim, federal habeas corpus relief does not lie on the ground that evidence obtained in an allegedly unconstitutional search or seizure was introduced against him at trial.  *Id.* at 482.  In *Riley v. Gray*, 674 F.2d 522 (6th Cir 1982), the Sixth Circuit held that to determine whether a petitioner was afforded a "full and fair" opportunity to litigate his Fourth Amendment claim, the court must undertake a two-prong analysis.  *Id.* at 526.  The court must first determine whether the State has a procedural mechanism that, in the abstract provides an opportunity to present a Fourth Amendment claim.  Assuming the State provides such a mechanism, the question then becomes whether the presentation of the claim was frustrated by a failure of that mechanism.  *Id.*

Pursuant to Michigan court rules, criminal defendants can challenge the admissibility of evidence during a preliminary examination or in the trial court.  M.C.R. 6.110(D).  Michigan court rules further provide criminal defendants with the right to appeal should such a challenge prove unsuccessful.   M.C.R. 7.203(A)(1).   The mechanisms provided by the State of Michigan are, therefore, clearly adequate.  *See Riley*, 674 F.2d at 526.  With respect to the second prong of the analysis, Petitioner has not demonstrated that his attempts to employ the available procedural mechanisms were frustrated.   The Court recommends, therefore, that Petitioner's various Fourth

Amendment claims are not cognizable in this proceeding.  Furthermore, even if addressed on the merits, Petitioner's claims are without merit.


A.      Scope of Search Warrants

With respect to his assertion that police officers "expanded their search of [his] property well beyond the scope of the search warrant," Petitioner asserts three claims.  He claims that his 1988 Chevy Blazer was unlawfully seized and searched.  He further claims that his deer stand was improperly searched.  Finally, Petitioner asserts that officers illegally seized guns and computers from his residence.

Law enforcement officials obtained two search warrants in this matter.  One authorized the search of Petitioner's northern Wisconsin cabin.  (Dkt. #3, Exhibit C2).   The other search warrant permitted the police to search Petitioner's primary residence, as well as "all [Petitioner's] vehicles, including but not limited to a 1988 Chevrolet Blazer."  (Dkt. #3, Exhibit C1).  The search warrants further authorized police to search these areas for, among other things: (1) "any computers or computer equipment capable of sending, receiving, or storing electronic mail"; and (2) "firearms, ammunition, [and] documentation indicating firearm ownership."  *Id.*   Thus, Petitioner's argument that his Blazer was improperly searched and guns and computers unlawfully seized from his residences is wholly without merit.

As for Petitioner's claim regarding his deer stand, the result is the same.  While Petitioner alleges that his deer stand was unlawfully searched, there is neither evidence nor allegation that the police seized any evidence from the alleged search of the deer stand.   While the police must generally confine any search to the boundaries

articulated in the search warrant, the remedy of exclusion applies only where evidence is actually recovered from the search of area beyond the search warrant's scope.  *See United States v. Hendrixson*, 234 F.3d 494, 497 (11th Cir. 2000); *United States v. Zaldivar*, 2006 WL 2947827 at *13 (M.D. Fla., Oct. 16, 2006) (citing *Horton v. California*, 496 U.S. 128, 140 (1990)).  Thus, even if the Court assumes that the alleged search of the deer stand was not permitted by the terms of the search warrants (a matter which Petitioner has not established) Petitioner has failed to demonstrate that the search thereof resulted in the introduction against him of any illegally obtained evidence.

### B.    Probable Cause

Petitioner argues that there did not exist probable cause to issue the two search warrants pursuant to which law enforcement obtained much of the evidence on which his conviction was based.  Because the authorities did not seize any evidence from Petitioner's cabin, the Court need only consider whether there existed probable cause to search Petitioner's primary residence and his vehicles.  (Dkt. #3, Exhibit C2).

A search warrant satisfies the Fourth Amendment "if it was issued by a magistrate [who] had a substantial basis for. . .conclud[ing] that a search would uncover evidence of wrongdoing."  *United States v. McPhearson*, 469 F.3d 518, 523-24 (6th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).   In reviewing the determination that there existed probable cause to conduct the search, the Court must examine the totality of the circumstances and must also afford "great deference" to the magistrate's determination.  *McPhearson*, 469 F.3d at 524 (citations omitted).   The affidavit submitted in support of the search warrant "must contain particularized facts

demonstrating a fair probability that evidence of a crime will be located on the premises of the proposed search." *Id.* (citations omitted).

In support of the search warrant to search Petitioner's vehicles and primary residence, Detective Erlandson submitted a lengthy affidavit detailing (among other matters) the following facts: (1) a search of Gerald Koetje's residence following his murder revealed two receipts, both of which were issued by a Phillips 66 gas station located in DeForest, Wisocnsin; (2) both of these receipts bore the name of Lloyd Riddle; (3) an examination of these receipts revealed Lloyd Riddle's fingerprints; (4) the owner of the Phillips 66 gas station in DeForest, Wisconsin, informed police that he had, in fact, issued the two receipts in question to Lloyd Riddle; (5) Donna Koetje initially denied knowing Petitioner, but subsequently acknowledged that she knew Petitioner and received e-mail communication from him; (6) Gerald Koetje had been shot in the head; (7) the Koetje residence had been "ransacked" and Gerald Koetje's truck was missing; (8) on the night of Gerald Koetje's murder, a man observed an individual exit a truck (later determined to be owned by Gerald Koetje) and exit the area in a "dark-colored, late 1980's model full-size Chevrolet Blazer" driven by a second individual; and (9) Lloyd Riddle owns a black and gray 1988 Chevrolet Blazer.  (Dkt. #3, Exhibit C1).  The facts asserted in this affidavit clearly satisfy the aforementioned standard and authorized police to search for the items identified in the search warrant.

C.      Failure to Present Copy of Search Warrant

Petitioner next asserts that the officers executing the search on his primary residence "did not provide the occupant of that home, Connie Riddle, with evidence of

any search warrant." Petitioner asserts that this alleged failure violated his Fourth Amendment rights and required the suppression of the evidence uncovered during this search.

Even assuming that the authorities failed to provide Ms. Riddle with a copy of the search warrant, such does not violate the Fourth Amendment. *See United States v. Grubbs*, 547 U.S. 90, 98-99 (2006) (the Fourth Amendment does not require that the official executing a search present the property owner with a copy of the warrant before conducting his search); *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms*, 452 F.3d 433, 440-47 (6th Cir. 2006) (*en banc*) (a search conducted pursuant to a validly issued search warrant is not invalidated based on the manner in which officers conducted the search, including the alleged failure to produce a copy of the search warrant); *United States v. Hurwitz*, 459 F.3d 463, 472 (4th Cir. 2006) ("the Fourth Amendment is not offended where the executing officer fails to leave a copy of the search warrant with the property owner following the search or fails even to carry the warrant during the search").

D.    Knock and Announce

Petitioner further asserts that the officers who conducted the search of his primary residence failed to properly knock and announce their presence before entering his property, thus violating his Fourth Amendment rights and requiring the suppression of the evidence obtaining during the resultant search. Even assuming that the officers who searched Petitioner's residence failed to comply with the knock and announce requirement, a matter which Petitioner has not established, Petitioner was not entitled to

the suppression of the evidence obtained during the search.  *See Hudson v. Michigan*, 126 S.Ct. 2159, 2163-68 (2006) (exclusion of evidence is not an available remedy for violations of the knock and announce requirement); *United States v. Ferguson*, 2007 WL 3226194 at *4 (6th Cir., Oct. 26, 2007) (same).

**VI.**          **Ineffective Assistance of Counsel Claims**  (Habeas Claims IX and X)

Petitioner has asserted numerous claims that he was denied the right to the effective assistance of trial counsel.  Specifically, Petitioner asserts that his attorney rendered ineffective assistance by: (a) failing to file pretrial motions to change venue and suppress evidence; (b) failing to conduct any meaningful investigation prior to trial; (c) failing to file meaningful and necessary pretrial motions; (d) failing to inform Petitioner of his rights and options; and (e) failing to utilize available defenses at trial.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must first establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms.  *Id.* at 688.  In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689.

Petitioner must further establish that his attorney's performance was

prejudicial in that it denied him a fair trial.  *See Id.* at 687; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so <u>manifestly</u> ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original); *see also, West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

A.     Failure to File Pretrial Motions

Petitioner asserts that his attorney should have moved for a change of venue based upon prejudicial pretrial publicity.  Petitioner also faults his attorney for failing to assert the Fourth Amendment claims discussed in the preceding section.  Petitioner further faults his attorney for not seeking to sever his trial from that of Donna Koetje and Jay Dolfin.

As discussed above, Petitioner's right to a fair trial was not violated by having the trial conducted in Kent County.  Thus, Petitioner cannot demonstrate that he was prejudiced by his attorney's failure to move for a change in venue.  As also discussed above, Petitioner's Fourth Amendment claims are without merit.  Accordingly, Petitioner cannot demonstrate that he was prejudiced by his attorney's failure to move to suppress the evidence obtained during the searches of Petitoner's property and vehicle.

Petitioner argues that his attorney should have requested that Petitioner be tried separately from Dolfin and Koetje.  Petitioner asserts that the failure to obtain a severance resulted in the admission of evidence that violated his Sixth Amendment right to confront witnesses.  The Court first notes that the trial court ordered that Petitioner and

Defendants Koetje and Dolfin be tried by separate juries.  (Motion Transcript, Aug. 25, 2000, 3-5).  Thus, Petitioner was, in fact, granted a severance.  More importantly, as discussed above, Petitioner's claim that his Sixth Amendment rights were violated is without merit.  Thus, Petitioner cannot establish that he suffered prejudice as a result of his attorney's failure to move for a severance in this matter.

### B.   Failure to Conduct Pretrial Investigation

Petitioner has submitted the alleged transcript of an interview between himself and two detectives.  (Dkt. #3, Exhibit F5).  In this particular interview, Petitioner admitted to (among other things) the following: (1) in July or August 1999, Jay Dolfin asked him to kill Gerald Koetje; (2) while Dolfin did not promise him money, Petitioner believed that Dolfin would pay him in "physical labor" by helping him build "a cabin on the back of the garage on [his] land up north"; (3) he communicated with Donna Koetje via telephone and e-mail; (4) he subsequently met Donna Koetje in Michigan; (5) he possessed directions to the Koetje residence (provided to him by Dolfin); (6) he was given instructions regarding where to locate Donna's Koetje's garage door opener on the night in question so that he could enter the Koetje residence through the garage; (7) he was given the telephone number of the American Legion where Donna Koetje would be on the night of October 28, 1999; (8) he traveled to the Koetje residence (with Zielinski) on October 28, 1999; (9) he did so with the understanding that Dolfin expected Petitioner to "take care of" Gerald Koetje; (10) he located the garage door opener and drove his vehicle into the Koetje's garage; and (11) he intended to steal various items from the Koetje residence to "make it look like a burglary."

Petitioner then told the detectives that it was Zielinski that entered the Koetje residence and shot Gerald Koetje in the head.  Petitioner stated that Zielinski used his weapon to kill Gerald Koetje.  Petitioner claimed that he did not know that Zielinski intended to kill Gerald Koetje.  Petitioner asserted that he only went to the Koetje residence to steal a television.  Petitioner asserted that on the return trip to Wisconsin, Zielinski stated that he killed Koetje because "Jay told me that you wouldn't do it." Petitioner asserts that his attorney rendered ineffective assistance by failing to use this statement to impeach Ralph Zielinski.

First, the Court fails to understand how this statement *impeaches* Zielinski. Impeachment is generally considered to be the act of discrediting a witness, as "by catching the witness in a lie or by demonstrating that the witness has been convicted of a criminal offense."  *Taylor v. State*, 840 N.E.2d 324, 330 (Ind. 2006) (citing Black's Law Dictionary 768 (8th ed. 2004)).  While Petitioner is correct that the statement in question "names [Zielinski] as the killer," such does not necessarily qualify the statement as "impeachment" material.  This statement does not demonstrate that Zielinski lied when he testified that he did not kill Gerald Koetje.   Instead, this statement merely demonstrates that Petitioner told the detectives a different version of events that Zielinski testified to at trial.

More importantly, the Court fails to discern how the use of this statement to "impeach" Zielinski would have advanced Petitioner's cause.  The Court initially notes that it is not entirely clear that Petitioner would have been permitted under the Michigan Rules of Evidence to introduce the statement.  *See* Mich. R. Evid. 804(b)(3).  The Court will nonetheless assume that Petitioner could have utilized the statement in question.

However, had Petitioner attempted to utilize the isolated portions of the interview in which Petitioner alleged that Zielinski killed Gerald Koetje, the prosecution would certainly have requested that the *entire* statement be admitted. *See* Mich. R. Evid. 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it").

In that event, the aforementioned admissions that Petitioner made during the interview would have been presented to the jury.  Whatever benefit Petitioner might have gained by presenting to the jury his self-serving statement that Zielinski allegedly shot Gerald Koetje would have been lost in the avalanche of inculpatory statements Petitioner made during the interview in question.  Thus, Petitioner's counsel can hardly be faulted for not attempting to utilize this particular statement in his questioning of Ralph Zielinski.

Petitioner also asserts that his attorney failed to properly investigate several other matters.  However, Petitioner has failed to demonstrate that investigation of these matters would have produced exculpatory evidence, called into question his guilt, or would likely have resulted in a different outcome.  Thus, Petitioner cannot establish that he was prejudiced by his attorney's allegedly deficient performance.

C.      Failure to Inform Petitioner of his Rights and Options

Petitioner claims that his attorney failed to inform him "that he had a right to testify in his own behalf."  First, Petitioner has presented no evidence in support of this

allegation.  Moreover, had Petitioner testified he would surely have been impeached with the numerous inculpatory statements he made to detectives.   Given the overwhelming evidence of Petitioner's guilt, it is simply unreasonable to conclude that the outcome in this matter would have been different if Petitioner had testified.   Petitioner cannot, therefore, establish that he was prejudiced by his attorney's alleged failure to inform him that he had the right to testify in this matter.

D.      Failure to Utilize Available Defenses at Trial

Petitioner asserts that his attorney "failed to present available evidence and testimony to impeach the prosecution's case."  Petitioner has failed to identify precisely what "evidence and testimony" his attorney should have presented.   Petitioner has likewise failed to demonstrate that reliance on such "evidence and testimony" would have resulted in a different outcome.  Thus, Petitioner cannot establish that he was prejudiced by his attorney's alleged failure in this regard.

**CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Riddle's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. _ 636(b)(1)(C).  Failure to file objections within the specified time waives the right to

appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

<div style="text-align:right">Respectfully submitted,</div>

Date:  January 3, 2008

<div style="margin-left:50%">/s/ Ellen S. Carmody                    <br>ELLEN S. CARMODY<br>United States Magistrate Judge</div>